DVORA J. INTRATER, Plaintiff-Appellant, *v.* JEFFREY THOMAS *et al.*, Defendants-Appellees.

First District (5th Division)    No. 76-617

Opinion filed November 10, 1977.—Rehearing denied December 13, 1977.

Marvin J. Rosenblum, of Chicago, for appellant.

Edward J. Egan, of Chicago Transit Authority, and John J. O'Toole, both of Chicago, for appellees.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiff, Dvora J. Intrater, brought this action to recover damages for injuries she claimed to have sustained when the doors of a Chicago Transit Authority (CTA) elevated train allegedly closed on her body as she entered the train, throwing her to the ground. Defendants, Jeffrey Thomas and James Corey, were, respectively, the motorman and conductor of the train on which the incident occurred. The jury returned a verdict in favor of defendants and plaintiff appeals contending that: (1) the court erred in allowing defendants to introduce evidence of prior injuries; (2) certain evidence and statements by defendants regarding plaintiff's mental condition prejudiced the jury and denied plaintiff a fair trial; and (3) the verdict was against the manifest weight of the evidence. We affirm. The pertinent evidence follows.

Erling Hanssen, a witness for plaintiff, testified that on June 14, 1971, he took a bus to the Loyola-Sheridan CTA elevated train station on his way to work. Plaintiff was on the same bus and also exited at the Loyola station. The witness and plaintiff both ascended to the elevated platform and prepared to enter the first car on the waiting southbound train. Hanssen stated that he was following behind plaintiff and that when she tried to enter the car she was caught between the closing doors. On cross-examination Hanssen stated that he could not say exactly what happened, but he knew that plaintiff's feet were caught between the closing doors.

Plaintiff testified that on June 14, 1971, as she was entering a CTA train at the Loyola station, she stepped in with her right foot and all of a sudden the doors closed on her, throwing her to the floor. As she lay there with the major portion of her body inside the car and her feet extending through the doors toward the elevated platform, the doors continued to open and close on her, for approximately three more times. Finally, a fellow passenger helped her to her feet and she took a seat inside the train.

Plaintiff knocked immediately on the door of the motorman's cab and informed him that she had been caught between the doors. The motorman notified the conductor and plaintiff was asked if she wished to be taken to an emergency room, but she declined. Shortly thereafter, plaintiff noticed that her fingers, hands and knees were bleeding and she again summoned the motorman. The conductor was notified and he inquired again whether plaintiff wished treatment. She responded

affirmatively and was removed from the train at the Grand Avenue station and transported to the hospital.

Concerning her injuries plaintiff testified to numerous visits to three different doctors. She stated that she told one of her physicians, Dr. Kernahan, during the week prior to trial that she had strong pain in her shoulder, some pain in her ribs, and that her head bothered her. Dr. Kernahan responded by telling plaintiff she would have to learn to live with the pain. She testified that prior to the accident she had experienced some shoulder problems and headaches, but both of these ailments had worsened since the accident. Plaintiff also stated that in 1969 her doctor prescribed a lumbosacral belt, or "corset" for her to wear because of back pain she was experiencing. She only wore it for a few weeks, however. Plaintiff testified that she had been in the hospital for a period of almost three weeks approximately 12 years ago. At that time she had been placed in isolation, which upset her, so she was assigned to a psychiatrist to talk to. She also received some psychiatric care in 1969 in connection with another physical ailment. Following the instant accident, since 1973, she had been seeing a psychiatrist for treatment for a depressed state, emanating from a concern over the injuries she had allegedly received in this incident and their effect on her ability to work.

Dr. William T. Kernahan testified that he treated plaintiff following the accident for pain in her right shoulder and lower back. He prescribed a new lumbosacral corset for her since her old one was worn out and ordered out-patient physical therapy for her. Dr. Kernahan continued treating and seeing plaintiff numerous times during the following years. During her later visits plaintiff continued to complain of shoulder and back pain. Dr. Kernahan found no further physical incapacity and noted that the range of shoulder movement had increased since the accident. He advised her to see a psychiatrist concerning her anxiety and depression, however. Such anxieties could cause a patient to magnify the extent of her pain and disabilities.

Dr. Mercedes Argudin testified that she had been plaintiff's psychiatrist since early in 1973. She was treating plaintiff for a "depressive reaction" condition. Such condition in this case could have been caused, in the doctor's opinion, by an emotional reaction to her physical limitations following her accident. However, it could have been in reaction to any incident which tended to make plaintiff more dependent upon others. Plaintiff was worried about losing her job due to her bad back and limited shoulder movement.

Dr. Henry Head testified that he saw plaintiff at the hospital on the day of the accident. She was complaining of soreness in her knees, arms, shoulders and back and appeared to be in distress due to her injuries. She clearly had abrasions on her knees and fingers. She had bandages on her

legs, knees and hands. Dr. Head referred plaintiff to Dr. Kernahan, but he also saw her in the ensuing years concerning her complaints about headaches and shoulder and back problems. In Dr. Head's opinion, the instant occurrence caused plaintiff's loss of shoulder mobility and aggravated her previously existent lower back problems.

Dr. Eugene Blonsky testified for the defense that he examined plaintiff in 1969. At that time he took her medical history which revealed that she had suffered head and neck injuries in a 1956 fall. Following this fall she had had headaches which she "relieved by Bufferin" but which had returned prior to the 1969 examination. During his examination of plaintiff, Dr. Blonsky found that plaintiff had some limitation of motion in her right shoulder due to bursitis pain. An electroencephalogram revealed the presence of a "discharging lesion" in the left temporal lobe area of plaintiff's brain. Dr. Blonsky explained that such a lesion merely meant a region in the brain which irregularly "discharged electrically" its impulses. It did not indicate a space-occupying lesion, such as a tumor. The doctor also diagnosed plaintiff as having degenerative arthritis in her spine, but concluded that most of her problems were of a psychiatric nature. He stated, however, that both plaintiff's physical problems, as well as her depressed mental state, could have been aggravated by the instant occurrence.

Defendant Jeffrey Thomas testified that he was the motorman on the CTA train involved in the instant occurrence. The motorman's cab was on the right-hand side of the lead car, while the passengers at the Loyola station entered from the left-hand side. He could not see the passenger's door from a sitting position in his cab. The first notice that defendant had of any unusual occurrence that day was when someone knocked on his window and reported that a passenger had had an accident. Thomas stated that the CTA car doors were such that they would continue opening and closing if an object were between them.

Defendant James Corey was the conductor on the instant train. At the Loyola station he followed the usual procedure of putting his head out of the window and looking before closing the doors. No one was attempting to board the train when he closed the doors, and Corey did not see anyone protruding from any door. He first learned of the accident after the train had left the Loyola station.

Corey stated that while he could not see the actual front doors on the first car, he would be able to see anyone attempting to enter those doors. Only if the passenger stopped right on the edge of the door, after entering, would Corey not be able to see him. Likewise, if a passenger's feet were protruding from a door for any distance Corey would observe them; however, if they were just caught within the door itself he probably could not see them.

Corey testified further that the CTA train doors are two-sectioned and open inwards in an arc fashion. The doors are edged in hollow, flexible rubber, which contain protective "recoil" devices that cause the doors to spring open when they encounter an object in the process of closing. The doors will continue to open and shut until the obstruction is clear of the doors.

William L. Simms, a defense witness, testified that he was in the CTA car in which this incident occurred. He observed plaintiff enter the train and fall toward the floor. At that time the doors were open. Plaintiff fell to her hands and knees, and then the train doors started to open and close. Simms thought the doors were touching plaintiff's ankle as they closed. He testified that plaintiff's feet were partially out of the train, her toes extending into the space between the train and the station. Simms held the doors open and helped plaintiff to her feet.

Simms admitted that he had previously filled out a CTA information statement by stating, "I did not see how the accident happened." In the same statement, concerning the cause of the accident, Simms had written "unknown." Simms explained that while he did not know how or what caused plaintiff to fall, the doors were open when the accident occurred. He noticed no defect in the platform or car floor which would have caused the fall. In addition, the doors only closed on plaintiff two or three times after she fell before Simms helped her to her feet.

OPINION

■■ Plaintiff contends that defense references to previous injuries and illness deprived her of a fair trial. Particularly, plaintiff argues that the testimony of Dr. Blonsky concerning her 1956 head and neck injuries, and the 1969 electroencephalogram should not have been admitted. In response, we note initially that such testimony was not objected to by plaintiff at trial. It is well settled that objections to testimony may not be raised for the first time on appeal. (*General Electric Cablevision Corp. v. City of Peoria* (1972), 8 Ill. App. 3d 948, 291 N.E.2d 295; *Greim v. Sharpe Motor Lines* (1968), 101 Ill. App. 2d 142, 242 N.E.2d 282.) Thus, in the absence of proper objection, or a motion to strike testimony, alleged errors in the admission of testimony are not available as grounds for reversal. *Department of Public Works & Buildings v. Diel* (1967), 89 Ill. App. 2d 130, 232 N.E.2d 133.

■■ In addition, we note that the testimony concerning plaintiff's 1956 fall was relevant in this case. Plaintiff complained of headaches following the instant occurrence and proof that she had suffered such headaches on an intermittent basis for a number of years would at least have been relevant to the jury's consideration of the damages to be awarded. Evidence is relevant if it tends to prove a fact in controversy or renders a

matter in issue more or less probable. (*Wimberley v. Material Service Corp.* (1973), 12 Ill. App. 3d 1051, 299 N.E.2d 425.) If defendants had been found liable, certainly the amount of damages would have been a fact in controversy for the jury to decide.

Plaintiff contends secondly that certain evidence and statements by defendants regarding her mental condition denied her a fair trial. We disagree.

The first complained-of reference to plaintiff's mental condition occurred during the cross-examination of Dr. Kernahan, concerning his statement that plaintiff's condition of depression could have been the result of the instant accident. The following exchange occurred:

"Q: Now if Mrs. Intrater had been confined with a mental condition 12 years ago for some two week period, would you have been interested in knowing about that—

A: I certainly—

Q: (Continuing) in connection with your statements

A: Yes

Q: And were you informed about that

A: No."

■■■ We note again that plaintiff did not object to this reference at trial and thus her objections will not be entertained on appeal. Furthermore, however, our review of the record reveals no prejudice to defendant from such a statement. During further examination of plaintiff herself it became clear that this question referred to the period in which plaintiff was held in isolation and required the services of a psychiatrist to cope with her depression concerning her isolation. That evidence of such fits of depression are relevant to this case is obvious in view of Dr. Kernahan's response, and in view of the fact that plaintiff was apparently attempting to establish as a portion of her damages her present depressed mental state.

Plaintiff argues that defense counsel created an inference for the jury that she had been confined to a mental institute. In support she points to the following cross-examination of her present psychiatrist, Dr. Argudin:

"Q Did her sons tell you that she had been in a mental institution for some time 12 years ago?

A This was not mentioned, I was under the impression that Mrs. Intrater was a lady out of Mt. Sinai Hospital.

Q You didn't know anything about that hospitalization for her mental condition?

A I remember her son told me that when they first come from Israel the mother was kind of reacting, like a cultural shock, coming from one environment to the highly demanding civilization that we have in America, it's not an easy task, and this is

my understanding of the situation at the time.

Q You weren't aware of the hospitalization, were you?

MR. KALCHEIM [plaintiff's counsel]: I would like to get this straight. Counsel has constantly been referring to a medical institution, Judge. There has been no testimony that she had been in a mental institution.

THE COURT: I assume that you are going to have somebody testify:

MR. CALLAHAN [defense counsel]: She testified that when she first testified.

MR. KALCHEIM: Not a mental institute.

MR. CALLAHAN: I asked her if she had ever got any mental treatment, she said 12 years ago she was in the hospital for a week or two weeks.

THE COURT: That didn't make it a mental institution.

The objection is sustained, the jury is asked to disregard any question in regard to mental institution."

■■ We fail to find any prejudice to defendant from this exchange in view of the fact that counsel's objection was sustained, and the jury instructed to disregard any question in regard to mental institutions. Such instruction to disregard cured any error involved in defense counsel's reference to a mental institution. See *McKenna v. Chicago City Ry. Co.* (1921), 296 Ill. 314, 129 N.E.2d 814; *Shatkus v. Checker Taxi Co.* (1969), 111 Ill. App. 2d 1, 249 N.E.2d 704.

Plaintiff argues that the prime example of defense counsel's "persistence to peg plaintiff as a mental case" occurred during Dr. Blonsky's testimony concerning the 1969 electroencephalogram test given plaintiff. This test revealed the existence of a "discharging lesion." In addition, Dr. Blonsky felt that plaintiff had a "polyneuropoly," which was borne out by the nerve conduction test.

Plaintiff now objects that such testimony was not relevant and only acted to prejudice the jury. No objection or motion to strike was made, however, and thus we will not consider this objection.

In addition, however, the record clearly contradicts plaintiff's contention that Dr. Blonsky's failure to define these terms prejudiced her. The doctor explained that a discharging lesion merely indicated a portion of the brain which was irregularly "discharging electrically." He also explained that a polyneuropoly meant multiple damages to her nerves, which could have resulted from numerous factors. If such explanations were not satisfactory to plaintiff's counsel, he could have cross-examined Dr. Blonsky further in this regard.

■■ Lastly, we note that plaintiff's contention concerning the issues of her prior injuries and illnesses, and references to her mental state, all go to

the question of damages. The rule is, therefore, that any possible error which might have occurred in this regard is immaterial since the jury found against plaintiff on the issue of liability. See *Guenther v. Hawthorn Mellody, Inc.* (1975), 27 Ill. App. 3d 214, 326 N.E.2d 533.

■■ Plaintiff contends finally that the jury's verdict was against the manifest weight of the evidence. This court may set aside a verdict as being against the manifest weight of the evidence only where an opposite conclusion to that of the jury is clearly evident from the record. (*Bebb v. Yellow Cab Co.* (1970), 120 Ill. App. 2d 454, 257 N.E.2d 164; *Hoffman v. Wilson* (1965), 60 Ill. App. 2d 396, 208 N.E.2d 607.) Such an opposite conclusion is not so evident from the record in the instant case.

■■■ It is axiomatic that "[a] complaint for negligence must set out: the existence of a duty owed by the defendant to the plaintiff, a breach of that duty and an injury proximately resulting from the breach." (*Cunis v. Brennan* (1974), 56 Ill. 2d 372, 374, 308 N.E.2d 617, 618.) While defendants, as operators of a common carrier, were under a duty to use the highest practicable degree of care in conveying plaintiff (see *Anderson v. Yellow Cab Co.* (1975), 28 Ill. App. 3d 656, 329 N.E.2d 278), a review of the record reveals that the evidence was conflicting both as to any violation of that duty and proximate causation of plaintiff's damages. Thus, these issues presented questions of fact for the jury to decide.

Plaintiff argues that the testimony at trial, by witnesses for both sides, clearly established that she was hit by the closing doors of the CTA train. We note in response, however, that the evidence is controverted as to whether the doors closed on plaintiff as she entered the car, thus throwing her to the floor, or whether they first closed only on plaintiff's feet after she had already fallen.

It is for the jury alone to determine the credibility of the witnesses and the weight of the evidence on the controverted questions of fact. (*Wisniewski v. City of Chicago* (1974), 20 Ill. App. 3d 650, 315 N.E.2d 43.) In the instant case the jury obviously chose to believe Simms' account that the plaintiff initially fell to the floor without being touched by the doors, after which the doors closed two or three times on her feet. We cannot say that such choice was palpably erroneous. Indeed, such an account is consistent with defendant Corey's statement that he saw no one attempting to board the train when he closed the doors. Under such a sequence of events defendants did not breach the duty owed plaintiff by closing the doors on her as she entered the train, and thus, neither did they cause her fall and subsequent injuries.

Plaintiff asserts that she at least suffered some immediate and visible injuries for which defendants must be held liable. In support thereof she points to testimony concerning the condition of her hands, fingers and knees following her removal to the hospital. Such injuries, however, were

the result of the fall itself. Since the jury chose to find that defendants did not cause plaintiff's fall, they cannot be held liable for such injuries.

■■ The only injuries which might possibly be attributed to defendants' conduct in this case would be injuries to plaintiff's feet. The evidence is uncontroverted that the doors did close briefly on plaintiff's feet after she fell. However, there was no evidence of any injury to plaintiff's feet for which defendants might be held liable. In addition, as discussed further below, the closing of the doors upon plaintiff's feet after she fell is not, in this case, evidence that defendants breached the duty of care owed to plaintiff.

Plaintiff does indeed argue that even if she initially fell, without any impetus from the doors, then defendants were clearly negligent in closing the doors on her after she was on the floor. We must disagree.

As noted previously, defendants owed plaintiff the duty of using the highest practicable degree of care in conveying her in the train. In the instant case, there is sufficient evidence in the record to have allowed the jury to conclude that defendants did not breach this duty by closing the doors on plaintiff's feet after she fell. Defendant Thomas, the motorman, testified that he could not see plaintiff enter the doors from his position. Defendant Corey, the conductor, testified that he saw no one attempting to board the train as he closed the doors. In addition, Corey stated that from his position in the fourth car of an eight car train, he would be unable to see someone who was just inside the door of the first car and had stopped there. Simms testified that after plaintiff fell, her feet were in such a position that they were essentially at the edge of the door, not extending onto the platform. The jury could have concluded from such testimony that under such circumstances Corey could not have seen plaintiff's feet, and thus avoided closing the door on her.

In sum, there is no showing that defendants could have done anything more to prevent the doors closing on plaintiff's feet. Neither defendant could see plaintiff as she lay on the floor. It would not be practicable to expect the conductor to personally search each car before closing the doors, unless perhaps an unusual delay occurred wherein the doors would not close for some unknown reason. In this case, there was no evidence of any such delay. In fact, defendants testified that only a normal length of time passed at the Loyola station. Thus, our conclusion that the evidence does not support plaintiff's contention that defendants were necessarily negligent in closing the door on her after she had fallen.

■■ Lastly, plaintiff argues that certain safety equipment was lacking which would prevent the doors from repeatedly closing on an obstacle, and which would indicate to the conductor that someone was in the doorway. Such contention is not properly aimed at defendants in this case, however. Any alleged lack of equipment on the train is not related to

defendants' possible breach of their duty toward plaintiff. It was not their duty to equip the trains and they cannot be held responsible for alleged negligence in this regard.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.