PATRICK D. JOYNT *et al.*, Plaintiffs-Appellants, *v.* ROBERT F. BARNES, M.D., *et al.*, Defendants-Appellees.—(WILLIAM E. FREDERICK, M.D., *et al.*, Defendants.)

Second District   No. 76-528

Opinion filed April 19, 1979.

Barry Goldberg, of Goldberg & Goldberg, of Chicago, and Dario A. Garibaldi, of Flossmoor, for appellants.

Gates W. Clancy and James S. Mills, both of Geneva, Lord, Bissell & Brook, of Chicago, and Puckett, Barnett, Larson, Mickey, Wilson & Ochsenschlager, of Aurora, for appellees.

Mr. JUSTICE LINDBERG delivered the opinion of the court:
On July 3, 1974, the plaintiffs-appellants, Patrick and Shirley Joynt, filed an eight-count complaint alleging malpractice against six doctors and two hospitals. Prior to trial, motions for summary judgment were granted as to two of the defendants, Drs. William E. Frederick and Noel

Strasser. This summary judgment is not being appealed. A jury was impaneled and after plaintiffs presented their case each of the remaining defendants moved for a directed verdict. The trial court directed verdicts in favor of four of the defendants, Drs. James C. Pritchard, Harry Slobodin, Geneva Community Hospital, hereafter referred to as Community Hospital, and Mercy Center for Health and Care Services, hereafter referred to as Mercy Center, and denied the motions for directed verdicts as to Drs. Robert F. Barnes and Richard C. Bodie. After hearing the evidence and arguments the jury returned a verdict in favor of Drs. Barnes and Bodie.

Plaintiffs appeal, contending that the trial court erred in granting a directed verdict for Drs. Pritchard and Slobodin, and the two hospitals, the jury's·verdict in favor of Drs. Barnes and Bodie is contrary to the manifest weight of the evidence, and numerous prejudicial errors occurred during the course of this lengthy trial. We have reviewed the 5,040 pages of the trial transcript and the common law record and have considered the numerous arguments raised in the plaintiff's brief. It is our opinion that none of the issues raised by the plaintiffs nor any combination of them warrant a reversal. Accordingly, we affirm the judgment of the Circuit Court of Kane County.

On February 16, 1974, doctors, at Rush-Presbyterian-St. Luke's Hospital in Chicago, Illinois, not parties to this suit, diagnosed Patrick Joynt (hereafter referred to as Joynt) as having a form of tracheal cancer. It is the plaintiff's basic theory that the defendants committed malpractice by failing to correctly diagnose Joynt's condition. Plaintiffs further contend that as a result of this failure, Joynt was denied a possible course of treatment, namely surgery, that might have improved his prognosis.

This opinion would be lengthened needlessly if we engaged in a full discussion of the facts. Therefore we confine our discussion of the facts to the scope necessary to provide an explanation of our holding.

On October 22, 1973, Joynt went to the office of his family physician, Dr. Robert F. Barnes for the purpose of having a complete physical. On that day, besides having been Joynt's family physician for some twelve years, Dr. Barnes had a report from Dr. Noel Strasser, a radiologist, concerning chest X rays taken two days earlier at Community Hospital. Dr. Strasser's report stated he saw "a right peritrachael mass" and recommended a bronchoscopy or a scalene node biopsy. Dr. Barnes informed Joynt of the radiologist's suspicion of a mass, but did not inform him of the recommended tests. However, Dr. Barnes did refer him to a specialist in thoracic surgery, Dr. Richard C. Bodie, of Aurora, Illinois.

Dr. Bodie saw Joynt for the first time on October 27, 1973. After taking a case history and reviewing the X rays taken at Community Hospital, Dr. Bodie sent Joynt to Mercy Center for additional X rays.

There the standard posterior-anterior (PA) and lateral views taken at Community Hospital were repeated, and a series of specialized X rays, known as laminograms, were taken. These additional X rays were ordered in part because Dr. Bodie did not agree with Dr. Strasser's interpretation of the X rays taken at Community Hospital on October 20, 1973.

The X rays and laminograms taken on October 27, 1973, at Mercy Center were interpreted by Dr. Harry Slobodin, a radiologist. His report indicated no abnormalities in either the standard PA and lateral views or in the laminograms. After reviewing all of the X rays himself, and reading Dr. Slobodin's report, Dr. Bodie wrote letters to Dr. Barnes and to Joynt, essentially informing each that he, Dr. Bodie, could find no evidence of a tumor in Joynt's chest. In those letters Dr. Bodie also recommended that Joynt stop smoking.

At this point it is necessary for us to review Joynt's medical history and to note what was undisputably known by Dr. Barnes and/or Dr. Bodie and what may or may not have been known by them in October of 1973.

Joynt became Dr. Barnes' patient in 1961, when he was 16 years of age. As a result of their long-standing doctor-patient relationship, Dr. Barnes knew, on October 22, 1973, that Joynt was 28 years old and that he had smoked between 1 and 4 packs of cigarettes a day since he was 16 years of age. At the time of the October 22, 1973, visit Joynt complained of a nonproductive cough lasting over the past six weeks. Dr. Barnes' notes also revealed that Joynt had been experiencing dyspnea (shortness of breath) for the previous three months, and that he had lost 18 to 20 pounds in the previous six weeks without dieting. There is no mention in the doctor's notes of that date of any complaint of wheezing or hemoptysis (spitting up of saliva mixed with blood). Prior to October 1973, the last time that Dr. Barnes had personally seen Joynt was in February 1973, when he had diagnosed him as having influenza syndrome with tracheitis (inflammation and infection of the trachea).

According to Dr. Bodie, Joynt reported to him many of the same symptoms he had reported to Dr. Barnes, although the time duration of some of them varied. For example, Dr. Bodie's notes reveal Joynt had complained of a nonproductive cough for the previous six months instead of the six weeks reported to Dr. Barnes. Dr. Bodie's notes are in conformity with Dr. Barnes' on the question of weight loss and the lack of wheezing or hemoptysis. However, Dr. Bodie's notes make no mention of dyspnea. Patrick Joynt also complained to Dr. Bodie that his voice had not returned to normal since an incident some six months earlier when he had lost it yelling at a fellow worker. There was evidence that the plaintiffs had telephoned Dr. Barnes for advice when the incident

occurred and that he had advised Joynt that the problem was traumatic laryngitis and that his voice would return after a few days rest. While Joynt asserts that his voice never came back to normal, he never saw Dr. Barnes regarding the problem nor do Dr. Barnes' office records note any change in Joynt's voice.

From October 22, 1973, until January 16, 1974, Dr. Barnes saw Joynt on at least three occasions—November 6, November 30, and December 24, 1973. The plaintiffs contend that Dr. Barnes also saw Joynt on November 1, 1973, but Dr. Barnes' office records indicate that this was only a telephone conversation. The November 6 visit was for the purpose of running additional tests. These various tests failed to reveal anything new and the results were reported to Joynt at the November 30, 1973 office visit.

Based upon the letter from Dr. Bodie ruling out the possibility of a tumor, the negative results of the additional tests and Joynt's history of smoking and high-strung nature, Dr. Barnes diagnosed Joynt as suffering from chronic bronchitis with a manifestation of anxiety.

The December 24, 1973, consultation between Dr. Barnes and Joynt was made at Community Hospital where Dr. Barnes examined Joynt's knee which had been injured in a snowmobiling accident. At that time the doctor noted no new or changing symptoms, nor did Joynt make any additional complaints.

The next consultation between Dr. Barnes and Joynt occurred on January 16, 1974, when he came in for a physical prior to undergoing some rather extensive oral surgery. At that time Dr. Barnes found Joynt to be ill. He ruled out the oral surgery and prescribed inhalation therapy at Community Hospital for a condition he diagnosed as acute respiratory infection. Joynt did not respond to treatment and on January 21, 1974, he was admitted to Community Hospital after coming home from work completely exhausted and suffering from a fever.

Upon admission to Community Hospital, Joynt had the following symptoms: dyspnea, loss of voice, fatigue, and generalized pain in the chest. Chest X rays were taken on January 21, 1974, and revealed pleurisy in the right lung. This condition did not respond to treatment and eventually developed into bronchial pneumonia. During his hospital stay Joynt displayed two additional and disturbing symptoms. On at least one occasion he was observed to be wheezing and on January 25, 1974, for the first and only time he coughed up blood—hemoptysis. These new and disturbing symptoms plus a request by Joynt's wife prompted Dr. Barnes to once again call in Dr. Bodie.

On February 2, 1974, Dr. Bodie again examined Joynt and concluded that a bronchoscopy examination would be necessary to determine the cause of his medical problem. However, Dr. Bodie recommended that

such an examination be put off until the pneumonia cleared up. Joynt was informed of the need of the bronchoscopy and a tentative appointment for the procedure was set for February 22, 1974.

Joynt finally responded to treatment for his pneumonia and was scheduled to leave Community Hospital on February 13, 1974. However, at the request of his wife, Shirley, he was allowed to stay for an additional day so that he could go directly from Community Hospital to Rush-Presbyterian-St. Luke's Hospital in Chicago where Shirley had arranged for him to be admitted on February 15, 1974. The next day, February 16, a bronchoscopy examination was performed on Joynt. The examination revealed a tumor at the lower end of the trachea, or windpipe, at the point where the trachea splits off to form the two main bronchial tubes to each lung. This point is called the carcina. A biopsy was performed which revealed the tumor to be a primary, poorly differentiated adenocarcinoma of the trachea. In layman terms the diagnosis of Joynt's condition means he was suffering from cancer of the poorly differentiated adenocarcinoma type of cell that had originally developed in the trachea. Subsequent examinations revealed Joynt had developed superior vena cava syndrome, which meant that the cancer had become involved in the superior vena cava—the vein that drains the blood from the upper part of the body into the heart. Because the superior vena cava cannot be surgically removed or replaced, superior vena cava syndrome totally precluded a surgical remedy for Joynt's unfortunate malady. Joynt's doctors at Rush-Presbyterian-St. Luke's Hospital, Drs. LeRoy Pittfield Faber, Charles Kittle and Robert Jensik, placed him on radiation and chemotherapy. This treatment may have been successful in prolonging Patrick Joynt's life beyond the time his doctors originally expected him to live. However, Joynt died on January 23, 1979.

An important factor in this case is that tracheal cancer is a relatively rare disease—only 400 cases have been reported in world medical literature. The type of cancer cell and the location of Joynt's tumor made his malady even more rare. Another factor making the situation in this case even rarer is the fact that he was only 28 years old at the time the lesion was discovered. Most other reported victims of tracheal cancer were in at least their forties when the disease struck.

Because of its location in the midst of the chest surrounded by bones, the heart, and major blood vessels, the trachea is a very difficult organ to examine. The evidence is that conventional X rays are of little value in detecting a lesion in the trachea. A considerably more effective but by no means perfect diagnostic tool for the trachea is a specialized form of X rays called laminograms. A laminogram is an X ray taken by special technique which brings out the details at a particular depth of the structure while blurring the details of other depths or planes. A series of

such X rays taken at differing depths provide a fairly detailed picture of a given structure. However, it is estimated that between 5 to 10% of the tracheal tumors, benign and malignant, will go undetected by laminograms.

From the evidence it appears that the most effective diagnostic tool in detecting tracheal tumors of any kind is a bronchoscopy examination, which was the procedure used when Joynt's tumor was finally discovered. A bronchoscopy involves placing an instrument called the bronchoscope down the patient's throat. This tube-like instrument is equipped with fiber optics which permit the administering physician to conduct a visual examination of the trachea and the main bronchial tubes. The bronchoscope can also be fitted with surgical instruments which can be used to obtain tissue samples for biopsies. The procedure involves some risk and at least a day in the hospital as an out-patient.

The basic question in this case is whether the standards of good medical practice mandated that Joynt should have undergone a bronchoscopy examination in October 1973. It would prolong this opinion needlessly to go into a detailed discussion of the expert testimony given at trial on both sides of this question. It suffices to say that both the plaintiffs and the defendants were given a full opportunity to support their positions on this question.

Basically, the experts for the plaintiffs asserted that in view of Joynt's medical history and the October 1973 X rays taken at Community Hospital and interpreted by Dr. Strasser as indicating a right peritracheal mass, Joynt should have undergone a bronchoscopy examination in October of 1973 and if not then, most assuredly when he entered Community Hospital in January of 1974.

Drs. Barnes and Bodie respond by arguing that at all times the procedures they followed and the steps that they took were consistent with the standards of care for doctors in similar communities at that time. The defendants presented experts who supported Dr. Bodie's interpretation of the October 29, 1973, X rays as showing only normal tissue shadows, probably vena cava, and with his interpretation of the X rays and laminograms taken October 27, 1973, as showing no abnormalities.

After hearing over six weeks of testimony the jury answered this basic question in favor of Drs. Barnes and Bodie by reaching a verdict in their favor.

As to the issues raised by the plaintiff we first turn to their contentions concerning directed verdicts. Initially they assert that the trial court erred in directing verdicts in favor of Drs. Slobodin and Pritchard, Community Hospital, and Mercy Center. Next, the plaintiffs assert that the trial court erred by not granting their motion for a directed verdict or judgment not

withstanding the verdict against Drs. Barnes and Bodie. In both instances we reject the plaintiff's argument.

The standard for directing a verdict or granting a judgment *n.o.v.* is set forth in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, which holds "* * * verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand" at 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14. This same standard has been applied to medical malpractice cases by *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301. It is our judgment that the *Pedrick* standard was correctly applied by the trial court when it entered directed verdicts for Drs. Slobodin and Pritchard, Community Hospital, and Mercy Center. The *Pedrick* standard was also correctly applied when the plaintiffs request for a directed verdict or judgment *n.o.v.* against Drs. Barnes and Bodie was denied.

■■ To establish malpractice against a doctor, a plaintiff must establish the standards of care to which the doctor is to be held and then prove by affirmative evidence that the doctor violated those standards. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279, *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.) Malpractice on the part of a hospital is established by demonstrating that it failed to comply with the proper standards of care for institutions devoting themselves to the care of human beings and that the failure resulted in the injury complained of by the plaintiffs. *Ybarra v. Cross* (1974), 22 Ill. App. 3d 638, 317 N.E.2d 621.

It is our judgment that the plaintiffs failed to demonstrate any form of malpractice against Drs. Slobodin and Pritchard, Community Hospital or Mercy Center.

The only contact either plaintiff had with Dr. Slobodin and Mercy Hospital occurred on October 27, 1973, when Joynt went to Mercy Center as an out-patient for some X rays and laminograms which were interpreted by Dr. Slobodin. Nowhere in the lengthy transcript of this trial is there any evidence that the X rays and laminograms were anything but of a good diagnostic quality, and there is no evidence that Dr. Slobodin in any way misinterpreted those X rays and laminograms.

Dr. Pritchard's sole contact with either plaintiff occurred on February 5, 1974, when he performed and interpreted a pulmonary function study test on Joynt. Again, there is no evidence that Dr. Pritchard conducted the test improperly or in any way misinterpreted the results.

Joynt had the most contact with Community Hospital, ranging from the X rays taken October 20, 1973, to his confinement in that hospital from late January until mid-February 1974. However, nowhere in the massive

record is there any evidence that Community Hospital performed any test in an improper manner or that it at any time failed to perform any of its other duties contrary to the requisite standards of care. There being no evidence that any of the four defendants, Drs. Slobodin and Pritchard, Community Hospital and Mercy Center violated any duty to either of the plaintiffs or failed to live up to any requisite standard of care, we hold the trial court properly directed verdicts in their favor.

On the other hand, when the *Pedrick* standard is applied to the plaintiffs' motions for directed verdicts and judgments *n.o.v.* against Drs. Barnes and Bodie, we must conclude that the standard was not met. Viewing the evidence in the light most favorable to the nonmoving parties, the most that can be said is that there existed a question of fact that was in doubt. Therefore, we must conclude that the trial court properly allowed the jury to resolve that question.

■■ Next we turn to the plaintiffs' argument that the jury's verdict is contrary to the manifest weight of the evidence. In a jury trial, such as the case at hand, the jury, as trier of fact, is the sole judge of the credibility of the witnesses and as such its verdict will not be overturned by a court of review unless it is clearly contrary to the manifest weight of the evidence. (*Wisniewski v. City of Chicago* (1974), 20 Ill. App. 3d 650, 315 N.E.2d 43.) Our review of the record convinces us that there was ample evidence to support the jury's verdict. That is not to say that all of the evidence was favorable to Drs. Barnes and Bodie, for the record reveals that there were many conflicts in the testimony. There were conflicts as to when Joynt had what symptoms and when he reported them to his doctors, if at all. There are also conflicts in the expert testimony as to when a bronchoscopy examination should have been performed and in the interpretation of various X rays. While there were these and other conflicts in the expert medical testimony, all of the experts agreed on one thing, that medicine is not an exact science and that reasonable and equally qualified doctors could have different opinions when confronted with the same symptoms and they could give different interpretations to the same X rays. Perhaps this point was most dramatically made to the jury by Dr. Douglas Morton, an expert called by Dr. Bodie. In response to a hypothetical question, which embodied many of the same symptoms as Joynt's, Dr. Morton testified that there were three acceptable courses of treatment. Those alternatives were (1) to have the patient return in six to eight weeks for follow-up X rays so that any change in the X rays could be noted; (2) to do so as Dr. Bodie had ordered—new X rays and laminograms; or (3) to order a bronchoscopy examination. The plaintiffs' basic theory was that good medical practice required a bronchoscopy examination in October of 1973. The theory was supported by very credible expert testimony. However the jury was presented with equally

credible expert testimony in support of the position of Drs. Barnes and Bodie, that good medical practice did not require a bronchoscopy examination in October of 1973 and that the additional X rays and laminograms ordered by Dr. Bodie were sufficient to meet the requisite standards of care. When presented with such testimony we cannot say that the jury's decision was contrary to the manifest weight of the evidence and accordingly will not reverse it.

■■ ■ The plaintiffs allege reversible error where Dr. Barnes mentioned that he was paid by an insurance company for his consultation with Joynt on December 24, 1973, arising from a snowmobile accident unrelated to the malady he suffered upon which the lawsuit is based. Plaintiffs' objection was sustained and there was no further mention of insurance. While reference to insurance during a trial is generally improper, it is not *per se* reversible, as prejudice must be shown. (*Sheley v. Guy* (1976), 63 Ill. 2d 544, 348 N.E.2d 835; *Kitsch v. Goode* (1977), 48 Ill. App. 3d 260, 362 N.E.2d 446.) We do not believe the plaintiffs were prejudiced in any way by this brief, passing mention of insurance in this lengthy trial. Our belief is strengthened by the fact that one-time mention of insurance did not relate to the illness which is the basis of this suit. We hold that any error committed in this regard was harmless.

The plaintiffs assert that the trial court erred in failing to grant their motions for a mistrial made after some allegedly highly prejudicial testimony given by Drs. Douglas R. Morton and David R. Lewis, both of whom were called as expert witnesses by Dr. Bodie. The testimony of Dr. Morton objected to by plaintiffs concerns the doctor's own efforts to cease smoking. Dr. Morton testified that he had smoked an average of three packages of cigarettes a day for 22 years and had a cough, hemoptysis, wheezing, and dyspnea. His decision to stop 13 years ago was prompted by a plea from his then 9-year-old son, who had been "exposed to the propaganda of the American Cancer Society." Dr. Morton went on to testify that his symptoms, cough, hemoptysis, wheezing, and dyspnea, continued for up to 18 months after he quit smoking cold turkey. When asked if he would have been willing to undergo a bronchoscopy examination if he had had the same symptoms as Joynt, Dr. Morton answered that he would not have been willing.

The testimony from Dr. Lewis to which the plaintiffs objected came in response to a question regarding whether an earlier diagnosis of Joynt's condition would have had a beneficial effect on his prognosis. The doctor explained that he could not say whether or not it would have, because different people react in different ways to radiation and chemotherapy. In the process of his answer Dr. Lewis related how his wife had died within 6 months of having a small tumor surgically removed from her breast.

The malignancy spread to every organ of her body despite chemotherapy and radiation treatment that she had received.

In both cases, immediately after the testimony in question counsel for the plaintiffs objected and asked that a mistrial be declared. In both instances the motion was denied. The plaintiffs contend that the testimony in both cases was irrelevant, immaterial and highly prejudicial. We do not agree.

■ Any evidence that is offered to prove a proposition that is a matter of controversy in a case or is of probative value of a contested issue is "material." (*Migliore v. County of Winnebago* (1974), 24 Ill. App. 3d 799, 321 N.E.2d 476.) The evidence is relevant if it tends to prove an issue in controversy or makes the matter more or less probable. *Marut v. Costello* (1966), 34 Ill. 2d 125, 214 N.E.2d 768; *Intrater v. Thomas* (1977), 54 Ill. App. 3d 709, 369 N.E.2d 1339.

■■ ■ Dr. Morton's testimony concerned how his symptoms associated with smoking lingered long after he had stopped smoking. Since part of the defense raised by Drs. Barnes and Bodie was that Joynt's smoking habits tended to mask his condition, the testimony would seem relevant and material to the question of what the doctors should have expected to happen to his symptoms after Joynt stopped smoking. The testimony of Dr. Lewis concerned the fact that chemotherapy can have different effects on different people no matter what the size tumor in question. Since the question of whether or not Joynt's tumor ever was operable was in dispute, testimony on the effectiveness of chemotherapy would be relevant and material to the question of the amount of damage, if any, Joynt suffered because of the alleged negligent failure to diagnose his condition at an earlier time.

Expert witnesses, such as Drs. Morton and Lewis, are allowed to testify on the basis of their training and/or experience. (*Cannell v. State Farm Fire & Casualty Co.* (1975), 25 Ill. App. 3d 907, 323 N.E.2d 418; *Franzen v. Dunbar Builders Corp.* (1971), 132 Ill. App. 2d 701, 270 N.E.2d 118.) The fact that Drs. Morton and Lewis each related an experience of a personal nature did not disqualify them as expert witnesses. The evidence that they offered was relevant and material. Accordingly, we hold that the trial court did not err in admitting the testimony into evidence and denying the plaintiffs' motion for a mistrial.

The plaintiffs allege that the trial court committed reversible error by allowing Drs. Morton and Lewis to answer improper hypothetical questions. The plaintiff alleged that the hypothetical questions were improper for two reasons. First, they called upon the doctors to base their opinions on reports, test results, and the opinions of other doctors and technicians and then allowed the doctors to choose which facts and

reports to believe. Secondly, the plaintiffs assert that the hypothetical question omitted certain relevant and undisputed matters of fact.

■■■ Any fact that has a basis in the evidence presented may be assumed to be true in a hypothetical question. (*Gus T. Handge & Son Painting Co. v. Industrial Com.* (1965), 33 Ill. 2d 201, 210 N.E.2d 498.) Nor is there any requirement that all the material facts be included in a hypothetical question. Rather it is the function of the adversary to supply any omitted facts to test what, if any, effect they would have upon the expert's opinion. (*Wirth v. Industrial Com.* (1974), 57 Ill. 2d 475, 312 N.E.2d 593.) In the case at hand, the facts contained in the hypothetical questions all had an evidentiary basis, and plaintiffs' counsel had a full opportunity to supply the facts he contends were omitted during his cross-examination of Drs. Morton and Lewis. Therefore we hold that the hypothetical questions asked were not improper.

■■ Another contention by the plaintiffs is that Patrick Joynt was subject to improper cross-examination. Their basic assertion is that counsel for Dr. Barnes made improper references to Joynt's deposition. Plaintiffs identify four such incidents. The first occurred when defense counsel was attempting to establish that Joynt had received certain records before being deposed and at his deposition stated that he was in general agreement with those records. This information is relevant to the question of when Dr. Barnes was aware of certain of Joynt's symptoms and therefore was admissible. (*Marut v. Costello* (1966), 34 Ill. 2d 125, 214 N.E.2d 768, *Intrater v. Thomas* (1977), 54 Ill. App. 3d 709, 369 N.E.2d 1339.) Furthermore, we find nothing improper in the defense counsel's method of eliciting this information.

The remaining three incidents of which the plaintiffs complain involve incidents where questions and answers from Joynt's deposition were read to him in an effort to refresh his recollection. On two of these occasions Joynt stated his recollection was refreshed and that he had given the answers as read from his deposition. On the third occasion concerning whether Dr. Bodie had informed him of his desire to conduct a bronchoscopy examination, Joynt stated that his recollection was not refreshed. However, proof of this incident was presented by Dr. Barnes in his defense case.

■■ Hence, the three incidents complained of involve one instance where Joynt's earlier statement was properly proved up by evidence in Dr. Barnes' defense case, and two instances where Joynt stated that his recollection had been refreshed. The method of refreshing a witness' memory and the reliability of that means is within the sound discretion of the trial court. (*Kerz v. Arkin* (1971), 2 Ill. App. 3d 1057, 278 N.E.2d 124.) To support their position that the trial court abused its discretion, the plaintiffs have cited *People v. Ferguson* (1973), 11 Ill. App. 3d 914, 297

N.E.2d 658. We find *Ferguson* to be inapplicable to the case at hand as there the State's Attorney was permitted to read the entirety of a witness' testimony from a previous trial. Here the trial court permitted the reading of only a few specific questions and answers. Accordingly we hold the trial court did not abuse its discretion in allowing this method of refreshing the witness' memory.

Another issue raised by the plaintiffs is that they were materially prejudiced when the trial court prevented them from presenting Dr. Howard Fishman as an expert witness. We have carefully reviewed the facts surrounding this incident and are of the opinion that the trial court acted within its sound discretion.

At approximately 3:45 in the afternoon of Wednesday, May 19, 1976, the 21st day of trial, counsel for the plaintiffs finished his direct examination of Shirley Joynt. Immediately thereafter a conference took place in the trial judge's chambers during which several facts came to light for the first time. It was learned that the plaintiffs desired to call only one more witness, Dr. Fishman. Secondly, it came to light that Dr. Fishman had been present at the trial that day but had been sent home by plaintiffs' counsel sometime prior to 3:45 p.m. Thirdly, for the first time counsel for the plaintiffs informed the trial court that Dr. Fishman would not be available again to testify until Friday. Evidently, counsel for the plaintiffs expected the trial court would either have the defendants proceed with their defenses on Thursday or grant a continuance until Friday, so that the plaintiffs could complete their case. The defendants quite properly objected to the prospect of beginning their respective defenses with the plaintiffs still having an expert witness whose testimony they presumably would have to refute, waiting in the wings. The gist of what transpired thereafter is that the plaintiffs were instructed by the trial court to be prepared to proceed on Thursday morning or rest.

On Thursday morning, counsel for the plaintiffs informed the court that Dr. Fishman was unable to attend that day because he had patients requiring his attention and therefore the plaintiffs had no choice but to rest. While the plaintiffs never made a formal request for a continuance pursuant to Supreme Court Rule 231 (Ill. Rev. Stat. 1975, ch. 110A, par. 231), it is clear from the trial court's instruction to counsel for the plaintiffs to be prepared to "proceed or rest" on Thursday morning that such a motion would have been denied. However, assuming *arguendo* that such a request had been properly made, we hold that the trial court would have been acting within its sound discretion to deny it.

■■ A motion for a continuance is directed toward the sound discretion of the trial court. (*Griffith v. Young Men's Christian Association* (1972), 7 Ill. App. 3d 1040, 288 N.E.2d 718.) And once a trial is begun, especially grave reasons are required before such request will be granted because of the

inconvenience to the parties, the trial court and the jury. (*Schneider v. Seibutis* (1972), 3 Ill. App. 3d 323, 279 N.E.2d 37.) The factors mitigating against such "grave circumstances" in the case at hand are the fact that Dr. Fishman was present at the trial on Wednesday, that counsel for the plaintiffs knew that he was there and knew that he would not be able to testify on Thursday, yet instructed the doctor to leave without informing the trial court of the problem. Throughout the trial the trial court made an attempt to strike a balance between accommodating the various doctors called as witnesses and making effective use of the jury's time. However, whatever accommodations were made were made when the trial court had advance notice of the problem. Here the trial court was given no notice despite the fact that counsel for the plaintiffs knew of the problem beforehand. That knowledge on counsel for the plaintiffs part and the fact that the trial was in its 21st day, with the prospect of an equally lengthy defense, more than justified the trial court's instruction to counsel for the plaintiffs to be prepared to either proceed or rest the next morning.

■■ The plaintiffs also allege error on the trial court's part when it refused to allow them to call Dr. Robert Jensik as a rebuttal witness. Dr. Jensik's testimony could have easily been presented in the plaintiffs' case in chief as it was merely a rehash of the testimony of his partners, Drs. Kittle and Faber, who had testified as experts for the plaintiffs. Where proposed rebuttal evidence is a mere rehash of evidence already presented and could have been presented in the plaintiffs' case in chief, a decision as to whether or not to permit the rebuttal witness to take the stand is a matter of the sound discretion of the trial court. (*Kupcikevicius v. Fitzgibbons* (1976), 41 Ill. App. 3d 405, 354 N.E.2d 434.) A review of the record reveals that nothing new or surprising was introduced in the defenses of Drs. Barnes and Bodie. Therefore, repetition of the testimony contained in the plaintiffs' case in chief by Dr. Jensik was unnecessary. Accordingly, we hold no reversible error was committed when the trial court refused to allow the plaintiffs to call Dr. Jensik as a rebuttal witness.

■■ The plaintiffs contend that they were materially prejudiced by the testimony of Dr. William E. Frederick, who was allowed to testify as an expert witness in behalf of Dr. Bodie, despite the fact that he was not listed as an expert witness. However, Dr. Frederick was originally named as a defendant in this suit but had been granted summary judgment on the pleadings. The chief complaint of the plaintiffs is that at trial Dr. Frederick changed his testimony from what he had given at his earlier deposition. This is precisely the type of situation the procedure of impeachment is designed to remedy. The plaintiffs had the means to impeach Dr. Frederick available to them having previously deposed the doctor. They would have gained no additional advantage had the doctor

been listed as an expert witness. Accordingly we find this argument to be without merit.

The plaintiffs next argue that the trial court committed reversible error by permitting the defendants great latitude in examining witnesses called by the plaintiffs under section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1975, ch. 110, par. 60.) The plaintiffs contend that the latitude allowed by the trial court was so wide as to constitute allowing the defendants to present their case during cross-examination. The plaintiffs argue that this was *per se* reversible error. We disagree. The scope of cross-examination rests largely within the sound discretion of the trial court. That discretion will not be overturned on appeal unless it has been clearly abused. *Sweeney v. Max A. R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170.

Another issue raised by the plaintiffs is that they were prejudiced by counsel for Dr. Bodie making reference to a drawing of Joynt's tumor made by Dr. Faber and its admission into evidence and allowing it to go to the jury room. The drawing in question was prepared by a treating physician, Dr. Faber. It was a reasonably accurate depiction of the location of Joynt's tumor, a point of considerable importance in this case. It was the best piece of evidence depicting this highly relevant information. As such, we hold that it was well within the discretion of the trial court to admit the drawing as demonstrative evidence to aid the jury in its deliberations. *Smith v. Ohio Oil Co.* (1956), 10 Ill. App. 2d 67, 134 N.E.2d 526.

The next error alleged by the plaintiffs is their contention that the trial court erred by not informing the jury why Drs. Slobodin, Pritchard, the Community Hospital, and Mercy Center were no longer participating in the trial after the close of the plaintiffs' case. The plaintiffs' position appears to be that they were prejudiced by the trial court's failure to inform the jury that the above-mentioned defendants had been granted directed verdicts. However, the plaintiffs have not shown this alleged failure to have prejudiced them. Irrespective of the liability or lack thereof on the part of Drs. Slobodin and Pritchard, the Community Hospital, and Mercy Center, in order to recover from either Dr. Barnes or Dr. Bodie the plaintiffs still had to establish by a preponderance of the evidence that one or both of the doctors were negligent in their care and treatment of Joynt. By its verdict the jury indicated that it felt that the plaintiffs had not met that burden of proof.

Next we turn to the plaintiffs' contention that the trial court permitted the defendant doctors in general to make unresponsive, self-serving answers, and in particular, allowed Dr. Bodie to go into an irrelevant, lengthy, detailed description of a pneumonectomy (the surgical removal of a lung or part thereof). As to Dr. Brodie's description of a pneumonectomy, we note that his expertise as a chest surgeon had been

attacked during the plaintiffs' rather lengthy section 60 examination. The description of a pneumonectomy was merely an attempt to rehabilitate him by demonstrating his expertise and was therefore relevant. (*Marut v. Costello* (1966), 34 Ill. 2d 125, 214 N.E.2d 768; *Intrater v. Thomas* (1977), 54 Ill. App. 3d 709, 369 N.E.2d 1339.) Further, the plaintiffs have not met the burden of demonstrating how they were prejudiced by this testimony. (*O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 364 N.E.2d 533.) Regarding the general complaint of self-serving answers, again the plaintiffs have not met their burden of showing prejudice (*O'Brien v. Walker* (1977), 49 Ill. App. 3d 940), as their argument merely consisted of a series of references to pages in the abstract where the alleged self-serving testimony appears. We have examined each of these incidents in detail and do not find them to be particularly self-serving. Rather we find them to have been responsive answers to questions in areas of medicine where reasonable and equally qualified doctors could disagree.

The plaintiffs have made the same sort of unsupported argument alleging that the defendants made confusing motions regarding to which defendant certain testimony was to apply. Again the plaintiffs have merely cited pages in the abstract and have failed to meet their burden of showing prejudice. *O'Brien v. Walker* (1977), 49 Ill. App. 3d 940.

■■ Plaintiffs allege several errors to which they made no objections at trial and therefore are waived including: improper argument by defense counsel during closing argument; the trial court's suppression of certain admissions allegedly made by Dr. Barnes about which we note the trial court only suppressed admissions it considered irrelevant; and, a series of remarks relating to the selection of the jury and its deliberations in regard to which no prejudice has been shown. *Mulvey v. Illinois Bell Telephone Co.* (1973), 53 Ill. 2d 591, 294 N.E.2d 689, *O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 364 N.E.2d 533.

■■ Next the plaintiffs complain that the jury was allowed to separate for the night after the case had been submitted to it. The plaintiffs made no objection at the time and have not shown any prejudice caused by the separation of the jury. Where prejudice is not shown, the mere separation of the jury is not sufficient to void a verdict. (*Sanitary District v. Cullerton* (1893), 147 Ill. 385, 35 N.E. 723.) The plaintiffs also complain that the jury was not polled; however, that complaint has also been waived by the plaintiffs' failure to request such a poll. *Powell v. Feeley* (1868), 49 Ill. 143; *Wilcox v. International Harvester Co.* (1917), 278 Ill. 465, 116 N.E. 151.

■■ Lastly, the plaintiffs asserted *per se* reversible error occurred when an unknown person entered the jury's chambers during its deliberations. The record reveals that an investigation of this matter occurred and that it appears that another circuit court judge accidentally came in on the jury

as he was returning to his own courtroom late that evening. The verdict of a jury will be overturned on the basis of extrajudicial influence only when such misconduct results in prejudicing the verdict. (*Weaver v. Illinois Bell Telephone Co.* (1969), 114 Ill. App. 2d 10, 252 N.E.2d 387.) In the case at hand no such prejudice has been shown.

For the above stated reasons we conclude that no single error alleged by the plaintiffs nor any combination thereof warrants a reversal of this matter. Accordingly, the directed verdict entered in favor of Dr. James C. Pritchard, Dr. Harry Slobodin, Geneva Community Hospital, and Mercy Center for Health and Care Services, and the jury verdict in favor of Dr. Robert F. Barnes and Dr. Richard C. Bodie are affirmed.

Affirmed.

NASH and RECHENMACHER, JJ., concur.