CITIZENS NATIONAL BANK OF DOWNERS GROVE, Trustee, Plaintiff and Counterdefendant-Appellant, *v.* BERNARD F. MORMAN *et al.*, d/b/a Stop n' Chat Restaurant, Defendants and Counterplaintiffs-Appellees.

First District (1st Division)   No. 78-1062

Opinion filed November 19, 1979.

Crowley, Barrett & Karaba, of Chicago (Edward W. Barrett and Charles W. Siragusa, of counsel), for appellant.

J. Stirling Mortimer, Ltd., of Chicago, for appellees.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Citizens National Bank of Downers Grove, as Trustee under Trust No. 993, brought this action against the defendants, Bernard F. Morman and Patrick J. O'Connor, d/b/a Stop n' Chat Restaurant, lessees of certain property from plaintiff, to declare the rights of the parties concerning a disputed lease renewal option. Defendants answered and filed a counterclaim against plaintiff. After a bench trial, the court entered judgment for defendants on plaintiff's complaint and on their counterclaim. Plaintiff appeals.

Defendants, Bernard F. Morman and Patrick J. O'Connor, are the owners of the Stop n' Chat Restaurant in Westmont, Illinois. Defendants purchased the restaurant in 1967 from Walter and Helen Timmerberg, who were leasing the property on which the restaurant is located from the property's then owner, K & H Westmont Building ("K & H Westmont"), a partnership. The defendants had conditioned their purchase of the restaurant from the Timmerbergs on defendants obtaining a new lease from K & H Westmont. The Timmerbergs' sale of the restaurant to defendants closed when defendants signed a ground lease with K & H Westmont, dated June 1, 1967, for a 10-year term ending May 31, 1977, at a monthly rent of $150. The lease was signed for K & H Westmont by Sidney Herzog, one of its partners.

K & H Westmont sold the property where the restaurant is located to Philip C. Behoff on August 1, 1973, and assigned its lease with defendants

to him. Behoff eventually sold the property and assigned the lease to plaintiff on November, 16, 1976. Plaintiff presently holds title to the property as trustee for the benefit of George K. Durand.

The lease signed by defendants and by Sidney Herzog for K & H Westmont contains typewritten language stating that defendants have an option to renew the lease for five years, and an option to renew for a second five-year term, at a monthly rent of $150, and also a right of first refusal if the land should be sold. A line has been drawn through the typewritten words stating that defendants may renew at a monthly rent of $150 and have first refusal rights. The following handwritten words appear on the lease just below the lined-out language: "Option of first 5 year and 2nd 5 year at a yearly rental to be agreed upon by mutual consent prior to expiration of each option period." The initials "S.H." and "J.P.R." are handprinted next to these words.

George K. Durand, plaintiff's beneficiary, sent a letter dated November 23, 1976, to defendants informing them that he had purchased the property on which their restaurant is located and that unless they renewed their lease for the first five-year period at a rent mutually agreed upon, they would be required to vacate on May 31, 1977. This letter was based on Durand's and plaintiff's belief that, prior to the time the lease was signed by defendants, the typewritten words on defendants' lease had been lined out and the handwritten words added and that, therefore, only the handwritten words were effective.

Defendants refused to enter into negotiations with plaintiff or Durand for renewal of the lease at a mutually agreed upon rent. Defendants' refusal was based on their belief that the typewritten words had been lined out and the handwritten words added without their consent after they had signed the lease, and that only the typewritten words were effective. Also, defendants' attorney had sent a letter, dated February 27, 1976, to Philip Behoff stating that defendants elected to renew their lease for the first five-year option period. Defendants felt, therefore, that they had already renewed their lease for five years at a monthly rent of $150.

On May 4, 1977, plaintiff filed a complaint for a declaratory judgment pursuant to section 57.1 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 57.1). Plaintiff asked that the trial court declare the rights of the parties under the lease and order that defendants vacate the property by May 31, 1977, unless defendants renewed the lease at a rent mutually agreed upon with plaintiff.

Defendants in their answer stated that their lease had been materially altered without their consent after they had signed it and asked the court to recognize that they had exercised their first option to renew and were entitled to remain in possession for five more years at a monthly rent of $150. Defendants also filed a counterclaim, based on the fact that their

lease states in typewriting that they have "the unrestricted right to use the parking area on Lots 19, 20 and 21 immediately adjacent to [the restaurant]." Defendants alleged that plaintiff had erected a fence in this parking area and asked the court to find that the fence interfered with defendants' parking rights.

At trial, Sidney Herzog, plaintiff's witness, testified that on or about June 1, 1967, John P. Russell came to his home and presented for his signature the lease between K & H Westmont and defendants. Defendants were not present and had not yet signed the lease. Herzog stated that, at his request, Russell at this time lined out the typewritten words and added the handwritten words. Herzog testified that he and Russell then initialed the changes, after which Herzog signed the lease. Russell then took the lease to have defendants sign it, and about one week later Herzog received the lease back with defendants' signatures on it.

Herzog also testified that in an earlier deposition he had said he did not know exactly who had made the changes in the lease, or whether the changes were made at the same time he signed the lease, or sometime afterwards. He did know that the changes conformed to what he wanted. Herzog further testified that he normally would have had defendants initial the changes, but Russell had told him that he had a "power of attorney to accept anything." Herzog also stated that he never asked Russell to show him such a power of attorney and never asked Russell whom he represented, because "[i]t didn't make any difference to me."

Philip C. Behoff testified that when K & H Westmont sold the property on which defendants' restaurant is located and assigned its lease with defendants to him in 1973, the lease included the handwritten changes. Behoff further testified that he would not have purchased the property from K & H Westmont for $170,000 if he had believed the lease granted defendants two five-year options to renew at $150 a month rent. Behoff also stated that while he knew defendants' lease gave them the right to unrestricted use of parking lots 19, 20 and 21, he put a commuter parking lot designed for 72 cars in that area and allocated five spaces for parking by restaurant patrons. Defendants did not object to the commuter parking lot when it was proposed. Most of the restaurant customers came during the evening after the commuters' cars were gone. In the summer of 1974, Catherine Morman, defendant Bernard Morman's wife, told Behoff that defendants needed more parking spaces and Behoff then allocated five more spaces for restaurant customers. After this, Behoff testified, defendants did not complain to him about the parking area.

George K. Durand testified that defendants' lease with K & H Westmont contained the handwritten changes when Behoff assigned it to

plaintiff on November 16, 1976. Durand also testified that he had erected a fence in parking lots 19, 20 and 21, and that defendant Patrick O'Connor had complained to him when he was putting the fence up that it would interfere with defendants' right to use the parking lots, but he had told O'Connor the fence was going up.

Defendant O'Connor testified that John P. Russell was the Timmerbergs' broker for the sale of the restaurant to defendants. O'Connor testified that Russell acted on behalf of the Timmerbergs as an "intermediary" between Herzog and defendants when defendants obtained their lease from K & H Westmont, because defendants' purchase of the Timmerbergs' restaurant was conditioned upon defendants acquiring the lease. O'Connor and defendant Bernard Morman both testified that Russell never represented them and they never gave Russell their power of attorney. O'Connor stated that defendants' attorney negotiated the terms of defendants' lease with K & H Westmont.

Defendants and Catherine Morman testified that on or about June 1, 1967, they went to John P. Russell's office to sign the lease. Present were defendants, their wives, defendants' attorney and Mr. Russell. Sidney Herzog was not there, but his signature was already on the lease. Defendants signed the lease after their attorney had examined it and told them they could sign. Defendants and Catherine Morman further testified that when defendants signed the lease, the typewritten words stating defendants could renew the lease for $150 a month rent and had first refusal rights had not been lined out, and the handwritten words and initials had not been added. Defendants also stated that after they had signed the lease, they never authorized these changes.

Catherine Morman testified that about a week after the defendants signed the lease, she received a copy from defendants' attorney. She placed it in a file in the restaurant and did not have occasion to look for it until late 1976, when George Durand started erecting the fence in parking lots 19, 20 and 21. She was unable to find her copy of the lease at that time and contacted defendants' attorney, who told her to ask Philip Behoff for a copy. Behoff subsequently sent her a copy of the lease that included the disputed changes. Defendants testified that this was the first copy of the lease they had seen since they signed the original.

Catherine Morman further testified that there had been two burglaries at the restaurant. The first took place about six years ago, and the burglars took approximately $10 and went through the file where defendants' copy of the lease was kept, strewing papers from the file on the floor. She did not know if the burglars took defendants' copy of the lease on this occasion. The second burglary occurred about three years ago. The burglars took approximately $300 and searched through the files.

Some papers were missing from the files afterwards, but Mrs. Morman did not know if the burglars took defendants' copy of the lease.

Defendant O'Connor and Catherine Morman also testified that the fence which George Durand had put up in parking lots 19, 20 and 21 had affected defendants' business by precluding them from using approximately four-fifths of the parking area. O'Connor stated that he knew the fence had affected business because he had seen people drive into the parking area and leave without stopping in the restaurant when they had difficulty finding a place to park. O'Connor further testified that he complained to Durand when he started putting up the fence that it would interfere with defendants' parking rights in lots 19, 20 and 21, but Durand told him the fence was going up anyway.

Defendants' contract with the Timmerbergs to purchase the restaurant was also admitted in evidence. Paragraph 12 of this contract, dated May 15, 1967, states that defendants' purchase of the restaurant was conditioned upon defendants obtaining from K & H Westmont a 10-year lease containing two five-year options to renew the lease at rent of $150 a month and a right of first refusal in the event the leased land was sold. This contract was prepared by defendants' attorney.

John P. Russell did not testify. Plaintiff's attorney stated that a subpoena was issued for Russell, but Russell could not be found. The attorney for defendants earlier had taken Russell's deposition and offered during trial to stipulate that the deposition be filed and made part of the record, but plaintiff's attorney declined so to stipulate. The attorney who had negotiated defendants' lease with K & H Westmont and prepared defendants' contract with the Timmerbergs was unable to testify due to illness.

After hearing the evidence, the trial court entered judgment for defendants on plaintiff's complaint and on defendants' counterclaim. The trial court held that defendants had exercised their option to renew their lease as unaltered for five years at a monthly rent of $150, and ordered that plaintiff make parking lots 19, 20 and 21 available to defendants for unrestricted parking use.

Plaintiff maintains that the trial court's judgment was against the manifest weight of the evidence. Plaintiff contends that the trial court erroneously based its decision on the fact that John P. Russell was not authorized by defendants to negotiate alterations in the lease and did not have defendants' power of attorney. Plaintiff does not dispute the fact that Russell was not defendants' agent and did not have their power of attorney, but argues that the evidence shows the alterations were made before defendants signed the lease and, therefore, they should have been enforced. In support of its argument that the alterations were made prior to when defendants signed the lease, plaintiff urges that Sidney Herzog

was an impartial witness and his testimony should have been believed over that of defendants and Catherine Morman, who were biased.

■■■ A material alteration of a document is a change in its language, whether by interlineation or otherwise, which, if enforced, would have a legal effect different from the original language. (*Cerulli Construction Co. v. Proctor* (1959), 20 Ill. App. 2d 306, 155 N.E.2d 826 (abstract); 2 Ill. L. & Prac. *Alteration of Instruments* §2 (1953).) When a lease is altered prior to its execution, the alteration usually is considered part of the terms entered into by the parties upon execution and, therefore, is enforceable. However, a material alteration of a lease made after its execution by a party thereto cannot be enforced by that party (2 Ill. L. & Prac. *Alteration of Instruments* §22 (1953)), or by his successors in interest, even if they took in good faith (4 Am. Jur. 2d *Alteration of Instruments* §27 (1962)), against a party to the lease who did not consent to the alteration. In such a case, the alteration amounts to a fraud against the nonconsenting party and the nonconsenting party may have the lease reformed "so as to make it read according to its legal effect" as originally drawn. (*Dunn v. Heasley* (1940), 375 Ill. 43, 47, 30 N.E.2d 628.) The materiality of an alteration is a question of law, and whether there was an alteration and when the alteration was made are questions of fact. (2 Ill. L. & Prac. *Alteration of Instruments* §45 (1953).) When, as in this case, the alteration is established by inspection or is admitted, the burden of coming forward with evidence is on the party claiming the benefit of the lease as altered to show that the alteration was made under circumstances rendering it lawful. See *Pappa v. Zatz* (1950), 340 Ill. App. 642, 92 N.E.2d 494 (abstract); 2 Ill. L. & Prac. *Alteration of Instruments* §43 (1953).

The above statement of the law supports plaintiff's view that the fact Russell was not defendants' agent and did not have their power of attorney was not dispositive of the question of whether the alterations in the lease were enforceable against defendants. However, the record indicates the trial judge considered the issue as being whether the alterations already had been made when defendants signed the lease, or were made afterwards by Herzog without defendants' consent. Therefore, there is no reason to think that the court did not apply the correct law to the facts.

■■ In a bench trial, the trial judge's factual determination will not be disturbed on review unless it is contrary to the manifest weight of the evidence. (*Menicocci v. Archer National Bank* (1978), 67 Ill. App. 3d 388, 385 N.E.2d 63.) We have carefully reviewed the record and cannot say that it was contrary to the manifest weight of the evidence for the trial court to find that defendants' lease was altered without defendants' consent after they had signed it. The trial judge stated that he "was not impressed in the least by Herzog's testimony" and "thought he was very

evasive." The trial judge, as the trier of fact, is in the best position to determine the credibility of witnesses and to weigh their testimony. *Ross v. Steiner* (1978), 66 Ill. App. 3d 567, 384 N.E.2d 398.

Plaintiff argues that Herzog was an impartial witness and that this lends credence to his testimony. However, Philip Behoff testified that when K & H Westmont assigned him its lease with defendants, the lease contained the alterations, and that he would not have paid K & H Westmont $170,000 for the property if he had believed that defendants' lease granted them the right to renew for two five-year terms at a monthly rent of $150. George Durand also testified that defendants' lease contained the alterations when Behoff assigned it to plaintiff. It is apparent from this testimony that Herzog had an interest in establishing that the lease was altered before defendants signed it.

The view that defendants' lease was not altered until after they signed it is supported by the fact that defendants conditioned their contract to purchase the restaurant from the Timmerbergs on defendants obtaining from K & H Westmont a 10-year lease with two five-year options to renew at $150 a month rent and a right of first refusal if the land was sold.

■■■ Plaintiff argues that this condition of defendants' contract with the Timmerbergs was irrelevant and should not have been admitted into evidence. We disagree. Evidence is relevant if it tends to prove a fact in controversy or renders a matter in issue more or less probable. (*Intrater v. Thomas* (1977), 54 Ill. App. 3d 709, 369 N.E.2d 1339.) While a party's contract with a third person offered as evidence of the terms of a disputed contract is sometimes inadmissible for lack of relevancy, such evidence may be admitted if the trial court in its discretion finds that its probative value outweighs the risk of confusion and waste of time. (McCormick, Evidence §199, at 470 (2d ed. 1972).) The fact that defendants purchased the Timmerbergs' restaurant pursuant to a contract conditioned on defendants acquiring from K & H Westmont a lease containing terms for renewal identical to the terms lined out on the lease defendants signed with Herzog, by itself supported an inference that defendants' lease was altered without their consent after they had signed it. The trial court observed in its oral opinion that the terms of the contract condition were "almost identical to the words on the same typewriter with the rest of the things in there [the lease]" and also noted that the contract was drawn by defendants' attorney. Thus, it could have been further inferred from the testimony that, when defendants' attorney examined the lease before defendants signed it and then told them they could sign, the lease when executed by defendants conformed to the contract which admittedly defendants' attorney had prepared, *i.e.*, there were no changes on the face of the lease.

Plaintiff also contends that when a written agreement's language is plain and unambiguous, proof cannot be heard to contradict or vary its meaning. This general rule of construction is not applicable when the issue is whether an agreement was materially altered without consent after its execution. There is "no question as to the admissibility of parol evidence to show an unauthorized alteration of a written instrument, the object of such evidence being not to vary the terms of the instrument, but on the contrary to prove the terms thereof as originally executed." 4 Am. Jur. 2d *Alteration of Instruments* §86, at 79 (1962).

The trial court's conclusion that defendants' lease was altered after its execution without their consent was not against the manifest weight of the evidence and justified the court's reading the lease as it was originally drawn. Therefore, the letter of February 27, 1976, sent by defendants' attorney to Philip Behoff before Behoff assigned defendants' lease to plaintiff, stating defendants were renewing their lease, entitled defendants to remain in possession after May 31, 1977, for five years at $150 a month rent and to the unrestricted use of the parking area in lots 19, 20 and 21. See *Daehler v. Oggoian* (1979), 72 Ill. App. 3d 360, 390 N.E.2d 417.

■■ Plaintiff argues that defendants waived their right to unrestricted use of lots 19, 20 and 21 when Behoff established the commuter parking lot there. We disagree. The facts and circumstances would have to show defendants intentionally relinquished their parking rights in order to establish waiver. (12 Ill. L. & Prac. *Contracts* §409 (1955).) Behoff stated that when the commuter parking lot was established he originally allocated five spaces for restaurant parking, but had to allocate five more spaces when Mrs. Morman asked for them. Also, while Behoff testified defendants made no further complaints after this, Behoff also testified that most of defendants' customers came in the evening, after the commuters' cars were gone. In addition, George Durand admitted that when he began fencing parking lots 19, 20 and 21, Patrick O'Connor promptly complained to him that he was infringing on defendants' parking rights under the lease. Clearly, there was nothing in defendants' statements or actions that was inconsistent with their intention to insist on their parking rights. There was, therefore, no waiver by defendants of these parking rights.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.