(No. 46852.—■■■■■■■)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. JOHN A. CLINE, Appellee.

*Opinion filed May 19, 1975.*

William J. Scott, Attorney General, of Springfield, and C. Joseph Cavanagh, State's Attorney, of Springfield (James B. Zagel, John F. Podlinska, and Charles H. Levad, of Chicago, Assistant Attorneys General, of counsel), for the People.

Theodore A. Gottfried, State Appellate Defender, of Springfield (Richard J. Wilson, Deputy Defender, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Following a jury trial in the circuit court of Sangamon County, defendant, John A. Cline, was convicted of burglary and sentenced to a term of 1 to 3 years in the penitentiary. On appeal the appellate court affirmed the conviction, and we denied defendant's petition for leave to appeal. (*People v. Cline,* 8 Ill. App. 3d 917, *appeal denied,* 53 Ill.2d 606.) On *certiorari* to the United States Supreme Court, the judgment of the appellate court was vacated

and the cause remanded for further consideration in light of *Wardius v. Oregon,* 412 U.S. 470, 37 L. Ed. 2d 82, 93 S. Ct. 2208. (*Cline v. Illinois,* 414 U.S. 970, 38 L. Ed. 2d 214, 94 S. Ct. 295.) On remand, the appellate court held the Illinois alibi defense statute (Ill. Rev. Stat. 1969, ch. 38, par. 114—14) unconstitutional under *Wardius.* Since an alibi witness tendered by defendant was excluded from testifying at trial for defendant's failure to comply with this statute, the appellate court reversed the conviction and ordered a new trial. (*People v. Cline,* 19 Ill. App. 3d 446.) The State's petition for leave to appeal was granted prior to our decision in *People v. Fields,* 59 Ill.2d 516, which held the alibi statute unconstitutional. In light of that decision the State now contends solely that the improper exclusion of the alibi witness does not require reversal of the conviction, because it was, at most, harmless error.

Cline was indicted along with John Mariner and Gary Casper for the January 6, 1970, burglary of the Illinois Road Equipment Company in Bissell, Illinois. Mariner and Casper pleaded guilty to the charge. Their applications for probation were pending at the time they testified on behalf of the State at defendant's trial.

Mariner testified that on the evening of January 6, 1970, Cline and Casper came over to his house around 9 p.m. The three men then left in a car owned by defendant's father. About 10 p.m. they drove to the King Pin Bowling Alley where they remained for approximately one hour drinking beer at the bar. Mariner stated that during this time they spoke to no other patrons there. Mariner said that after leaving the bowling alley they stopped at the home of a friend for about 10 minutes, and then drove to Bissell, where they arrived between 11 and 11:30 p.m. At this time the three agreed to commit the burglary. Mariner and Cline were to break into the building, while Casper would drive off in the car and return later to pick them up. According to Mariner, he and

defendant climbed the 10-foot fence surrounding the building, and entered after Mariner broke a window in the front door. Mariner stated that they had been in the building for a period of 45 minutes to one hour, when the police arrived and directed a spotlight through the front window. He and Cline ran from the office to the garage area and concealed themselves. Hearing the police searching within the building, he informed defendant that he was ready to surrender. Mariner charged that after he was taken into police custody, one of the two arresting officers beat him for 20 minutes in an attempt to learn who, if anyone, was with him. Because of this beating, Mariner said he told the police that Cline was hiding somewhere in the building, and Casper was driving around in a car waiting to pick them up. Mariner was then taken to the county jail, where he made a statement, but refused, at that time, to admit that anyone else was with him.

On cross-examination Mariner stated that at the time of his arrest he was willing to say anything in order to have the police cease the beating. Mariner further said that he realized he would have to cooperate with the State's Attorney if he was to receive probation. But on redirect examination, he reaffirmed his testimony that Cline had participated in the burglary.

Gary Casper, the accomplice, related basically the same events. He testified, however, that after leaving the bowling alley, the three men drove directly to Bissell. He said that after dropping Mariner and Cline at the equipment company, he returned for them about 10 or 15 minutes later. By this time the police had arrived and he quickly drove away. The State Police then arrested Casper about midnight after they had received a description of the car involved in the burglary from Mariner.

Deputy Sheriff Carl Tuttle testified that at 11:37 p.m. on the evening of January 6, 1970, he and Deputy Michael Mayberry responded to a radio communication concerning a burglary at the equipment company. The company's

building was secured by a silent burglar alarm which was connected with the sheriff's office. As they reached the company premises, Tuttle saw a suspect run from the office. After entering the building Tuttle saw Mariner, as the latter was attempting to flee, and used force to subdue him, but he denied he used any greater force than was necessary. He asserted that Mariner voluntarily informed them that Cline and Casper were involved in the burglary. Mariner was handcuffed to a pole while these officers unsuccessfully searched the area for Cline. They did, however, find footprints in the snow leading to the fence on the north side of the building, although no evidence was presented to establish the time these footprints had been made.

Deputy Mayberry's testimony supported the testimony given by Tuttle. He stated that Tuttle used only the force necessary to subdue Mariner. Mayberry further related that Mariner had voluntarily informed them of Cline and Casper's participation in the burglary.

A third deputy, Bill Goveia, testified that he had received the radio communication regarding the burglary about 11:15 p.m. He was the first to arrive at the scene, and parked his car at the rear of the building. Deputies Tuttle and Mayberry arrived shortly thereafter and entered the front while he remained at the rear of the building for 5 to 6 minutes. Goveia then came to the front to further search the premises and the area along the fence. Although he found no footprints in the snow, there was an area along the fence near heavy machinery where he may not have seen footprints made by a person climbing over the fence.

Cline testified in his own behalf and offered an alibi defense. He stated that he did accompany Mariner and Casper to the bar at the bowling alley that evening. He said, however, that as he was leaving the bar to go to the washroom, he met Linda Amberg, whom he knew, and they made a date to meet at 11 p.m. at Skelly's Truck

Stop. Cline testified that when he and the others left the bar, Mrs. Amberg followed in her car. He stated that Mariner and Casper dropped him at the truck stop around 11 p.m. while they took the car to complete an errand for Casper. They were to return one hour later. While Cline and Mrs. Amberg were at the truck stop, Michael Landreth joined them about 11:15 p.m. The three talked together until approximately 12:15 a.m. when Landreth departed. Cline testified that he and Mrs. Amberg then left the truck stop to "park" on a deserted road. Mrs. Amberg later drove him back to the truck stop around 1:30 a.m. to wait for his friends. Cline stated that when they did not appear, he went home in a cab. Exhibits introduced into evidence indicated that the taxi dispatcher had received a telephone request to send a taxi to the truck stop about 1:40 a.m. The trip sheet of the cab driver who responded to this call showed that he had driven a party from that location to defendant's address.

On cross-examination, Cline admitted that after his arrest, he did not inform the police of his date with Linda Amberg. He explained that he did not want to involve her unless it became necessary, because she was married.

In support of Cline's alibi defense, Michael and Peggy Ann Eades testified that on the evening of January 6, 1970, they saw Cline, along with two other men, leave the bowling alley "right around eleven." Michael Landreth testified that he was with Cline and a girl named "Linda" at the truck stop that evening from approximately 11:15 p.m. to 12:15 a.m. When Cline attempted to call Linda Amberg as a witness, the State objected on the grounds that Cline had failed to comply with the alibi defense statute. (Ill. Rev. Stat. 1969, ch. 38, par. 114—14.) The statute required that a defendant intending to rely on an alibi defense must serve upon the prosecuting attorney, no less than 5 days before trial, a notice in writing of his intention to assert such alibi, and specific information as to the place that he maintains he was at the time of the

alleged offense and the names and addresses of the witnesses he intends to call to establish this alibi. Cline had filed such notice, but had failed to list Linda Amberg as an alibi witness.

The trial court sustained the State's objection, but permitted Linda Amberg to testify in an offer of proof made outside the jury's presence. In substance, she said that she met Cline at the bowling alley the evening of the burglary and they made a date to meet at the truck stop at 11 p.m. She then met Cline as planned shortly after 11 p.m. and remained with him until 1:30 a.m.

We hold that under these circumstances the exclusion of Linda Amberg's testimony was error of a constitutional magnitude. The State, however, relies on *Harrington v. California,* 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726, and *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, for the principle that the commission of an error of constitutional dimension does not require reversal of the conviction if the error is harmless beyond a reasonable doubt. The State maintains that the improper exclusion was harmless error because the evidence she would have presented was merely cumulative to the alibi testimony of Michael Landreth relating to the period from 11:15 p.m. to 12:15 a.m. on the evening of the burglary.

The evidence presented by the State showing Cline's involvement in the burglary rested entirely upon the testimony of his two alleged accomplices who had pleaded guilty to the crime and who were awaiting disposition of their requests for probation. No physical evidence was proffered by the State connecting Cline with the commission of the burglary. In presenting his alibi defense, Cline testified to his meeting with Linda Amberg at the bowling alley and to their date later at the truck stop. He explained that initially he did not want to involve her in the case because she was married. We note that in his closing argument, the assistant State's Attorney alluded to Cline's

testimony as being "only partially corroborated." Obviously this was an indirect reference to the unexplained absence of Linda Amberg as an alibi witness and it may have created the negative inference that had she been called as a witness she would not have substantiated defendant's alibi. Had she testified, the jury might well have considered, in weighing her credibility, not only her testimony, but the additional factor of a married woman admitting that she was with a man other than her husband under such circumstances. Reviewing these various factors in light of the record presented, we cannot say that the improper exclusion of Linda Amberg an an alibi witness was harmless beyond a reasonable doubt.

Accordingly, the judgment of the appellate court is affirmed.

*Judgment affirmed.*