THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SAOUD A. MAHDI, Defendant-Appellant.

First District (4th Division)    No. 79-707

Opinion filed October 30, 1980.

Banks & Price and Michael J. Goldstein, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendant was convicted of murder, aggravated assault and attempted murder and was sentenced to 20 years' imprisonment. He appeals contending that (1) the court erred in refusing to allow defendant to add to his list of witnesses the day before jury selection began; (2) the court erred in failing to hold a hearing on his motion to suppress identification; (3) the court erred in ruling that certain photographs shown to witnesses were not unduly suggestive. We find that while the court did

err in refusing to allow the additional witnesses, the error was not prejudicial; that the trial court was entitled to draw its own conclusions as to the suggestiveness of the photographs, and that since the photographs were not included in the record, we cannot review the correctness of the trial court's determination.

In October 1975, the defendant, Saoud Mahdi, was charged with the murder of William Smith and the attempted murder and aggravated assault of Donald Miller which occurred on September 3, 1975. His attorney at that time (who is not present counsel) filed an answer to the State's motion for discovery stating he intended to call Shaly Jiwadt, Ali Moustafa and Napil Salama as witnesses. While defendant did not indicate in his answer to discovery that he intended to rely on an alibi defense, it is clear from the State's arguments made on the motion to amend this answer that it was aware that defendant intended to rely on an alibi defense. The defendant also filed a motion to quash the arrest and suppress the identification. The motion to suppress was based on the fact that the identification by the witnesses through the use of photographs was induced by the action of the police and that defendant's picture was the only one of an Arab included in the six photographs shown to the witnesses.

On June 29, 1978, the defendant changed attorneys. On July 20, 1978, the new defense counsel attempted to file an amended answer to the discovery motion. The answer listed as additional witnesses "any and all personnel of Evans Funeral Home, of Evergreen Cemetery and Mausoleum, of the major television stations and of Tabernacle Hospital." He explained to the court that there were certain accounts of the events of September 3, 1975, which might become relevant, that he had made a diligent search for those accounts and had someone working on it "at this moment" and the reporters were searching their files. The State objected to the adding of 20 or so new witnesses "at the twelfth hour" and indicated that the alibi defense was that the defendant was driving to Toledo and he had three or four witnesses who would so testify.

On July 21, defense counsel came back into court and indicated that he might want to add to the list of witnesses the names of two persons whom he believed were still living in the Cleveland area. He explained that he had known from the time he became involved in the case that defendant had stayed in Ohio but defendant could not remember the exact names of the witnesses. His investigation had been continuing to the present date. There were some language barriers and communication barriers and he still did not have the exact names of the witnesses. He was awaiting a phone call to get this information. If he did locate the witnesses and call them, he would make them available the day before for the State to interview. The court indicated that it did not believe that

allowing the witnesses would put the State at a disadvantage and that it would allow them to be called if counsel could secure them in time for the State to interview them.

On July 24, 1978, defense counsel informed the court that the name of the Cleveland witness was Nageeb Afaneh. He was flying to Chicago, would arrive late that night and would be presented to the State first thing the next morning to be interviewed. At the arguments on the post-trial motion it was asserted that the witness had been flown in and had been available to testify.

On July 26, after it had rested its case, the State for the first time indicated it had a statement from two of the three defense witnesses originally listed in the defendant's answer to discovery; that these witnesses stated that the defendant's brother's funeral was a week prior to the shooting and that at the time of the shooting he was not in Chicago, he was enroute to Cleveland or in Cleveland. While the state's attorney claimed this information had been given to the original defense attorney, both present and prior defense counsel filed affidavits stating that the first time they received this information was on July 26. These affidavits were not contradicted by the State. The court then ruled that, except for the defendant or those witnesses on the previous list, it would not allow defense counsel to call anyone who would testify differently from what those witnesses indicated they would testify to. In other words, defense counsel could not call any new witnesses, such as personnel of the funeral home, who would testify the funeral took place on September 3.

On July 27, 1978, after the defense concluded its case, defense counsel made the following offer of proof:

> "The list of witnesses which I amended contained a number of individuals and businesses, that was the Evans Funeral Home, located at 59 and Western and the offer of proof would be that if called, the director, if the director had been called to testify, he would testify that in fact the funeral of Mafti Mahdi was scheduled for September 3, 1975. He would testify to the size of the procession to the time that the funeral was scheduled to arrive at the cemetery and confirm the fact that the funeral was on September 3, 1975 as the Defendant, as a witness testified to.
>
> The persons of Evergreen Cemetery would testify they had a funeral scheduled and interment scheduled for 1:00 o'clock that afternoon as was testified by the defense witnesses.

* * *

> Mr. Nageeb Afaneh, who was the gentleman in Cleveland would

have testified to the fact that the second man going who was in fact his cousin, he had a conversation with Jaweet who indicated to him he wished to take Mr. Mahdi to Cleveland. Mr. Mahdi was quite upset and stayed with him for a few days.

Mr. Afaneh did in fact come here the first time he had ever seen Mr. Mahdi was previously at the funeral, that he thereupon left to Cleveland after having made the arrangements to stay at his home and sometime that evening, shortly after he had arrived home and Mr. Mahdi and several other gentlemen arrived with them in Cleveland, Ohio, he remained there for several days or weeks and returned back to the State of Illinois."

He further informed the court that the news media did not have the information he had thought they had.

On July 20, 1978, the court also considered the motion to quash the arrest and suppress identification. There was some testimony that an arrest warrant had been issued, and the court ruled that it would deny that portion of the motion if the warrant was produced. Apparently this was done off the record. No appeal has been taken from this ruling.

The State for the first time on July 20 produced the photographs which had been shown to the witnesses. The defense objected to the photographs because while the defendant was an Arab the only picture of an Arab in the group was that of the defendant. The remaining photos included one of a Negro, one of a white man and several other persons of Puerto Rican or Mexican descent. The defendant requested that on the following morning (July 21) he be allowed to call the prosecution witness who viewed and the police officers who had shown the photos, none of whom was present in court on July 20. The trial court denied the request, stating there had been enough difficulty getting the case to trial. The selection of the jury actually began in the afternoon on July 21.

The trial court agreed with defense counsel that "if you say to pick out the Arab in the group, that you would probably conclude Mr. Mahdi was an Arab." He also stated that if he did not know Mahdi was an Arab and someone said Mahdi was either Cuban or Puerto Rican, he would agree. The judge concluded the photographs were not unduly suggestive. While the defendant has appealed from the decision, he has not included the photographs in the record on appeal.

At trial seven witnesses testified for the State: Dr. Choi, Dennis Siears, Captain James Flynn, Donald Maag, Anthony Perez, Police Officer John Bulger, and Donald Miller.

Dr. Choi, who performed the autopsy on William Smith, testified that Smith died of bullet wounds in the chest and abdomen. Smith had been shot three times, once in the hand. Tests showed that Smith had

been intoxicated—the blood showed the presence of 345 milligram percent ethynol, about 3½ times the amount needed before one is considered intoxicated.

Dennis Siears testified that on September 3, 1975, he was working at his gasoline station which was located on the southeast corner of 51st and Ashland in Chicago. He heard gunshots and walked northwest to get to the sidewalk at 51st Street next to his property. He saw two Arabs standing across the street on 51st Street in front of the cleaners. One of the men, whom Siears identified as the defendant, had a gun. He was putting it into the right side of his pants. The defendant then walked west to an alley which was immediately west of the cleaners. He got into a black Buick which was parked in the alley facing north. There was someone else behind the steering wheel. After defendant got in the car, the car took off heading north down the alley. The other Arab who had been with the defendant ran upstairs of the building where the cleaners was located. After this, Siears noticed a man lying on the south side of the street east of the filling station.

James Flynn is a captain with the Chicago Fire Department. He and four firefighters were returning from the Fire Academy in a 38-foot hook-and-ladder truck. The traffic westbound was "pretty heavy" and they were stopped. Flynn saw a man (Smith) lying on the ground on the south side of the street. He was lying in front of the end of a vacant lot; a tavern was immediately west. Another man was kneeling over him. This man was covered with blood.

Flynn instructed the driver to pull over to the side. The rig was too big to get to the curb; they just got out of the lane of traffic as best they could and parked on the north side of the street facing west and approximately in the area in front of the cleaners. Flynn and two of his men walked across the street to find out if they could be of any help. The man on the ground had been injured in some fashion. Flynn instructed his driver to call for an ambulance.

While he and two firefighters were standing with the man, Flynn heard a commotion in the background and heard some shots fired. He saw a man come around the back of the hook-and-ladder truck. Flynn saw him run across the street. The man stood over Smith and shot two or three shots into Smith's body. At this time the man was about one or two feet away from Flynn. Flynn and the other firemen then left. The man who had done the shooting ran towards the tavern. Flynn described the man as medium build, with bushy hair, wearing a print shirt. He could not identify him.

Donald Maag, a bartender at the tavern, then testified. He had been working at the tavern during the incident in question. At about 2:30 p.m. that day he noticed three or four persons across the street fighting. They

were about eighty feet away. When he noticed them start to cross the street, he locked the tavern door. When he saw the people going back across the street, he opened up the door to see if anything was wrong outside. He saw one man lying on the sidewalk and another, covered with blood, standing over him. They were about 25 feet away. Maag then heard a shot. He looked around and saw a "guy" standing out in the middle of the street pointing a gun at the "guy" standing by the man on the ground. Maag, having observed him for five to 10 seconds, turned immediately and ran back into the tavern as he did not want to be shot. He heard one more shot after that. When Maag was running into the tavern, he heard someone coming in behind him. Maag never looked at this person and did not know who it was. Maag ran into the back room, the storeroom, and locked the storeroom door.

When Maag talked to the police he told them the man who fired the shots was a male Arab. He testified there had been Arabs living in the neighborhood for five years and he knew what an Arab looked like. The police showed him some photographs and he picked out that of defendant. The following colloquy between witness and defense counsel ensued:

"Q. So you knew what an Arab looked like?

A. Yes.

Q. And you served the Arabs I believe in your tavern?

A. No.

Q. You never served an Arab in your tavern?

A. They never come in.

Q. You knew what they looked like?

A. I saw them walking the streets and they, they had the store across the street.

Q. And when you talked to the Chicago Police officers that day, did you tell them that the man who had fired the shots was a male Arab?

A. Yes.

Q. You told him he was an Arab?

A. Yes, looked like an Arab.

Q. And when you saw some pictures of the, the Chicago Police Department showed you in the tavern a few days later, you picked out a man that looked like an Arab?

A. Yes, it was the man.

Q. But the picture looked like an Arab, did he not?

A. Yes.

Q. Is the man sitting at the table look like an Arab to you?

A. Yes.

Q. You can see now looking at him he looked like the same man?

A. He is, he hasn't got the hair or mustache.

Q. But you can tell it's the same man in the courtroom as in the picture?

A. Right.

Q. You know what an Arab looked like?

A. Well, I picked him out."

The next witness, Anthony Perez, lived in the building which housed the cleaners. From his front window, he saw four people, one of whom was the defendant, fighting another person. He had known the defendant as a neighbor for about a year; the defendant lived directly above Perez. (According to the defendant, he lived on the other side of the building.) After the fight, Perez saw the defendant come back across the street. Perez went downstairs and walked out of the front door. He saw the defendant returning from the west. He had a gun "in his hip [*sic*]" and he pulled it out as soon as he got to the alley which is only about 20 feet from the door. Perez went back inside, went upstairs and looked out of his front window again. He heard a shot before he got to the window and when he got to the window he saw the crowd move away from the body. He saw defendant go by the body and stand right up on top of it and shoot into it several times. Defendant then ran across the street toward his building. Perez then heard some footsteps up the stairs and then on the back stairwell. Perez looked out of his back window and saw the defendant get into the right side of a black Century. The vehicle then drove off.

Perez told the police that it was the defendant who shot the victim, and he also identified a photograph of him. Perez agreed that quite a few Arabs lived in his building.

Sergeant Bulger testified that he interviewed several persons after the shooting. As a result of that investigation he went to defendant's apartment that evening, but it was empty. On September 24, 1975, the police went to an address on 55th and Keating, near the airport. Part of the reason they went to the address was that someone at that address had applied for utilities in the name of Mahdi. An old gentleman admitted them to the first floor. Bulger did not know who the man was. They asked him if the defendant lived there. He said the defendant was sleeping on the second floor. The police went upstairs, found the defendant asleep, arrested him and searched his clothing. They found a travel document issued September 22, 1975, for one nonstop trip to Aman, Jordan, within 30 days of the date of issuance. The document was in the defendant's name.

Donald Miller was the last witness to testify for the State. He and the victim were drinking in Cornell Park on 51st Street on the day of the occurrence from about 11 a.m. to 2 p.m. Miller had "two, maybe three" beers. About 2 p.m. they went to a currency exchange on 51st and right

off of Ashland to cash a check. When they left they saw three or four Arabs fighting a Mexican American. They did not go back and call the police but instead intervened in the fight. The Arabs turned on them and the Mexican American ran away. The two were knocked down and kicked. Then the Arabs stopped for a while, so the two men crossed to the south side of the street. They made no effort to go into the tavern or to call someone for help. In a few seconds the three or four men came across the street and the fight resumed. Miller was knocked down and kicked in the face. When the fight was over, Miller came back and found Smith on the street. He appeared to be unconscious.

At this point Miller heard a commotion behind him. He turned around and saw a man running across the street with a gun. The man was about 25 or 30 feet away. Miller identified this man as the defendant. He had never seen the defendant before September 3. This was the second time he had seen the defendant on September 3. The first time was between the two fights when the defendant threw something across the street at them.

When Miller saw the defendant coming with a gun, he immediately turned and ran into the tavern. As he was running, he heard a shot and felt a burning sensation in his leg. Miller went into the back of the tavern. He did not attempt to call the police. A few minutes later, he left the tavern by the back door and came around the back of the tavern to 51st Street. He left without speaking to any of the policemen who were there. The police picked him up a couple of blocks away.

On October 20, 1975, the day of the preliminary hearing, Miller was asked to look at some photographs. He had not been asked to do so before. He identified the defendant's photograph. He then came into the courtroom and identified the defendant who was seated next to his attorney in the courtroom. At the trial Miller was shown some photographs. He did not believe that he had seen some of the photographs which the State said were those shown the witnesses. He said that the photos shown were all of Arabs. He agreed that those the State claimed were the pictures shown to the witnesses were not all pictures of Arabs.

The defendant and Napil Salama, one of the three witnesses on the original answer to discovery, were the only witnesses to be called by the defense.

Napil Salama testified he had known the defendant for eight or nine months—they were more acquaintances than friends. The defendant, who had no car, asked Salama to drive the defendant and his mother and brothers to the funeral on September 3. A brother of the defendant and another "guy" were being buried. Salama picked them up about 9:30 or 10 a.m. They then went to the Evans Funeral Home at 69th and Western. They arrived about 10, 10:15 a.m. They left the funeral home to go to the

cemetery between 12:30 and 1 and arrived between 1 and 1:30. The cemetery was located at 87th and Kedzie. There were between 300 and 400 automobiles in the funeral procession.

Salama and the defendant left the cemetery around 2 or 2:10 p.m. They went to Salama's house at 4716 South Keating. This is 4700 west in the city of Chicago. Cicero is the next major street. They arrived around 2:30 p.m. Salama picked up some money there. As he was coming out, he met Shaly Jiwadt and Ali Moustafa who wanted to go to Cleveland with them. They left in Jiwadt's Cadillac at about 2:40 that afternoon going directly to Cleveland. They arrived in Cleveland at about 12:30 E.D.T. The three came back the next day but left the defendant there.

The defendant testified that although he and his family were still living on 51st Street on September 3, 1975, they had several weeks before arranged to move because the neighborhood was bad. About three weeks earlier he had arranged to move to 57th and Keating and had made a downpayment. The defendant's brother and a friend, both 15 years old, were shot to death by an off-duty policeman about the end of August. Their funeral was on September 3, 1975. Salama drove him to the funeral. They arrived sometime after 10 a.m. After the funeral they drove to the cemetery.

Some friends told the defendant "We're going to take you somewhere." He went with Salama to his house, at 47th and Keating. The defendant waited in the car while Salama went into his house. He returned about five minutes later. Some other friends came over. Salama asked the defendant to go with them and he did. They went to Cleveland where the defendant stayed with Salama's cousin for 12 days. He did not, on September 3, 1975, go back to 51st and Ashland and shoot Smith and Miller.

Defendant applied for a travel document for Jordan five days before he received it. He wanted to go back to Jordan because his father and brother had both died in the last few months. His uncle had come over to take him back. Defendant intended to go and make some money and then bring the family back to Jordan.

After hearing the evidence and arguments of counsel the jury returned a verdict of murder and aggravated battery and attempt murder. The defendant was sentenced to 20 years' imprisonment.

## I.

The defendant first contends that the trial court erred in refusing to allow the witnesses on the defendant's amended list to testify. We agree, but find no basis for reversal on that ground.

The witnesses excluded were those not on the defendant's original

list of witnesses. It is true that Supreme Court Rule 413(d) (Ill. Rev. Stat. 1975, ch. 110A, par. 413(d)(i)) requires a defendant to list the witnesses he or she intends to call. Nevertheless, this does not mean that a trial court may in every case exclude a witness not on the list. As was stated in *People v. Rayford* (1976), 43 Ill. App. 3d 283, 286-87, 356 N.E.2d 1274, 1277, *appeal denied* (1977), 65 Ill. 2d 579:

> " 'The basic purpose of a trial is the determination of truth' (*Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416, 86 S. Ct. 459, 465, 15 L. Ed. 2d 453, 460); and the goal of pretrial discovery in both civil and criminal cases has been to promote the fact-finding process and to eliminate the tactical advantage of surprise by either side. Sanctions are designed to accomplish the purpose of discovery; but it is clear that the imposition of sanctions should not encroach on a fair trial. (*Department of Transportation v. Mainline Center, Inc.*, 38 Ill. App. 3d 538, 347 N.E.2d 837.) The exclusion of evidence is a drastic measure; and the rule in civil cases limits its application to flagrant violations, where the uncooperative party demonstrates a 'deliberate contumacious or unwarranted disregard of the court's authority.' (*Schwartz v. Moats*, 3 Ill. App. 3d 596, 599, 277 N.E.2d 529, 531; *Department of Transportation v. Mainline Center, Inc.*, 38 Ill. App. 3d 538, 347 N.E.2d 837.) The reasons for restricting the use of the exclusion sanction to only the most extreme situations are even more compelling in the case of criminal defendants, where due process requires that a defendant be permitted to offer testimony of witnesses in his defense. (*Washington v. Texas*, 388 U.S. 14, 18 L. Ed. 2d 1019, 87 S. Ct. 1920.) 'Few rights are more fundamental than that of an accused to present witnesses in his own defense.' (*Chambers v. Mississippi*, 410 U.S. 284, 302, 35 L. Ed. 2d 297, 308, 93 S. Ct. 1038, 1045.)"

In many cases the exclusion of a defense witness whose name was omitted from the list of witnesses has been held to constitute an abuse of discretion. *In re Lane* (1979), 71 Ill. App. 3d 576, 390 N.E.2d 82; *People v. Jackson* (1977), 48 Ill. App. 3d 769, 363 N.E.2d 392, *appeal denied* (1977), 66 Ill. 2d 633; *People v. Rayford* (1976), 43 Ill. App. 3d 283, 356 N.E.2d 1274, *appeal denied* (1977), 65 Ill. 2d 579.

■■ In the present case the defendant presented the amended list of witnesses before the trial began. There was ample opportunity for the prosecution to have interviewed the witnesses. (Compare *People v. Pugh* (1977), 49 Ill. App. 3d 174, 363 N.E.2d 1212, *appeal denied* (1977), 66 Ill. 2d 634; *People v. Jackson* (1977), 48 Ill. App. 3d 769, 363 N.E.2d 392, *appeal denied* (1977), 66 Ill. 2d 633; *People v. Rayford* (1976), 43 Ill. App. 3d 283, 356 N.E.2d 1274, *appeal denied* (1977), 65 Ill. 2d 579.) It was

irrelevant whether the proffered witnesses contradicted some prior statement of the witnesses originally listed; there is no statutory requirement that the testimony of all the witnesses be consistent.

■■ However, while the exclusion of the witnesses was erroneous we find that under the particular circumstances the error was not prejudicial. The defendant's sole contention is that "the additional alibi testimony would have added credence to the alibi defense and could have changed the impression of the jurors." Were the excluded witnesses in fact alibi witnesses as in *People v. Cline* (1975), 60 Ill. 2d 561, 328 N.E.2d 534, and *In re Lane* (1979), 71 Ill. App. 3d 576, 390 N.E.2d 82, we might agree. But they are not. The cemetery and funeral home employees could only testify as to where the defendant was over one hour before the shooting. Furthermore, defendant's and Salama's testimony as to this point was uncontradicted. The proffered testimony of Afaneh that the defendant arrived in Cleveland late that night was irrelevant since it in no way tended to show where defendant was at 2:30 that afternoon. Even accepting as proven that defendant arrived in Cleveland at 12:30 a.m. E.D.T., the defendant could easily have killed Smith before leaving.

## II.

■■ The defendant's second contention is that the trial court erred in denying the motion to suppress without granting a hearing. A defendant does have a right to a fair and impartial pretrial hearing to determine whether his identification by the witnesses was based solely on their observations or whether it was improperly influenced by the actions of the investigative officers or other extraneous factors which may have unduly affected the identification. (*People v. Seets* (1976), 37 Ill. App. 3d 369, 346 N.E.2d 61.) Here, however, the photographs were before the trial court which could and did make its own determination that they were not unduly suggestive. The defendant has not on appeal suggested what evidence he would have produced had there been a hearing. A claim of prejudice cannot be based on mere conjecture (*People v. Kelley* (1961), 23 Ill. 2d 193, 177 N.E.2d 830, *cert. denied* (1962), 370 U.S. 928, 8 L. Ed. 2d 507, 82 S. Ct. 1570), and it would not be proper for us to reverse even if the trial court did technically commit error in failing to hold a hearing where no prejudice has been shown. *People v. Skidmore* (1978), 56 Ill. App. 3d 862, 372 N.E.2d 723, *cert. denied* (1978), 439 U.S. 912, 58 L. Ed. 2d 258, 99 S. Ct. 282; *People v. Stoudt* (1967), 90 Ill. App. 2d 140, 232 N.E.2d 800, *appeal denied* (1968), 38 Ill. 2d 628.

## III.

■■ The defendant further contends that the trial court's determination that the photographs were not unduly suggestive was erroneous. How-

ever, since the photographs were not included in the record, we must presume that the trial judge's determination was correct (*People v. Doto* (1977), 53 Ill. App. 3d 62, 368 N.E.2d 577; *People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907; *People v. Fochs* (1976), 40 Ill. App. 3d 966, 353 N.E.2d 326; *People v. Benford* (1975), 31 Ill. App. 3d 892, 335 N.E.2d 106), and we cannot review his determination.

■■ Defendant argues that it is clear from the record that the defendant's picture was the only one of an Arab. That may be true but the trial judge also noted that if someone had told him the defendant was a Cuban or Puerto Rican he would have believed it. We cannot therefore conclude, absent evidence in the record to that effect, that the defendant was so distinctive that a picture of him included with pictures of Cubans or Puerto Ricans was unduly suggestive.

Since the photographs have not been shown to be unduly suggestive, we need not determine whether there was sufficient independent basis for the witnesses' identification.

Accordingly, the decision of the trial court is affirmed.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.