BERNICE WATERFORD, Plaintiff-Appellant, v. MAHMOUD HALLOWAY,
Defendant-Appellee.

First District (2nd Division) No. 85—1261

Opinion filed March 25, 1986.

Rick Allen White, of Chicago, for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Barry G. Bollinger, Kay L. Schichtel, and Mary T. Zerega, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff-appellant Bernice Waterford appeals from an adverse jury verdict in her medical malpractice action against defendant-appellee, Dr. Mahmoud Halloway. At trial, plaintiff assailed the adequacy of Dr. Halloway's treatment prior to, during, and subsequent to the hysterectomy he performed on her in November 1979. On appeal, plaintiff has elected to reassert malpractice only as to the post-operative care provided by Dr. Halloway. Specifically, plaintiff asserts that Dr. Halloway's care deviated from recognized standards of care in that he failed to diagnose and treat an abscess she developed following the operation. Additionally, plaintiff raises two trial errors for review. First, plaintiff alleges that the trial court erred when it permitted defendant to examine two treating physicians as experts, where they had not been designated experts in defendant's discovery disclosure. Second, Mrs. Waterford asserts that the trial court erred in failing to directly respond to a question posed by the jury during the course of their deliberations. For the reasons which follow, we affirm the judgment of the trial court.

As noted, plaintiff has abandoned many of the malpractice allegations raised at trial. It is therefore unnecessary to recapitulate all the evidence adduced during the trial. With this in mind, we briefly summarize the facts germane to the appeal.

Plaintiff went to her physician, Dr. Earl Frederick, regarding a gynecological problem she had developed. Dr. Frederick examined her and diagnosed the problem as uterine fibroid tumors, for which he recommended surgery. He referred Mrs. Waterford to defendant for that purpose. Dr. Halloway then examined plaintiff and confirmed Dr.

Frederick's diagnosis. Dr. Halloway also recommended a hysterectomy, and plaintiff acquiesced in that recommendation. The surgery was ultimately performed by Dr. Halloway on November 27, 1979.

Following the operation, Mrs. Waterford failed to respond as expected; in defendant's words, her post-operative course was "quite stormy." Plaintiff developed a fever which reached 103 degrees. Her hemoglobin count declined from 13 grams prior to the surgery to 8.6 grams, and then further to 7.3 grams. Plaintiff exhibited a foul-smelling discharge from the site of the surgery. As a result, Dr. Halloway initially placed plaintiff on an antibiotic regimen to ward off infection, and also directed that Mrs. Waterford be transfused to aid in combatting any infection. Defendant elected to delay that transfusion, however, so that an adverse reaction to that procedure would not be confused with the preexisting fever. Mrs. Waterford was eventually transfused on December 3.

On December 2, Dr. Halloway performed a vaginal examination of plaintiff, and determined that she had developed cellulitis, a diffuse infection of the wound site. Dr. Halloway did not find any evidence of an abscess, however. Because of Mrs. Waterford's continued distress, Dr. Halloway discussed the matter of her treatment with Dr. William Ashley, a specialist in internal medicine, who thereafter continued to see plaintiff on a daily basis. Dr. Ashley recommended, *inter alia*, that plaintiff be transfused with blood and that cultures be done of the "vaginal cuff and/or cul-de-sac." A culture of the former only was done, and as noted, plaintiff was transfused.

No further pelvic examinations of Mrs. Waterford were done. On December 7, an ultrasound examination of Mrs. Waterford revealed the existence of pelvic abscesses. An abscess is an encapsulated mass of infected material. In Mrs. Waterford's case, the abscess constituted a life-threatening condition, and necessitated immediate treatment. Dr. William McCarthy, a general surgeon, was called in by defendant to aid him in treating plaintiff. Dr. McCarthy performed a second operation on Mrs. Waterford on December 7 to deal with the abscess. During that second surgery, Dr. McCarthy discovered a hole in plaintiff's colon, and found adherences of the intestines in the original operative site. Plaintiff asserts that the hole was the product of Dr. Halloway's initial surgery, while defendant attributes it to the second operation. In any event, Dr. McCarthy repaired the hole in the colon and performed a colostomy, creating a surrogate anus while the injured portion of the bowel healed. He also aspirated and drained the abscess, the original reason for the operation.

As a result of this second operation, a third operation was later

performed to close the colostomy. Mrs. Waterford also suffered from additional complications during her recovery, including pleurisy, pneumonia, and two hernias, all of which she attributes to the initial operation performed by defendant.

We address first plaintiff's challenge to the adequacy of Dr. Halloway's post-operative treatment of her symptoms. As to this issue, plaintiff claims that the jury's decision that no actionable malpractice occurred was against the manifest weight of the evidence. Accordingly, plaintiff requests that we reverse their decision.

■ Neither party broaches any disagreement with the essential elements of the medical malpractice action. In order to hold a physician liable in such a case:

"[P]laintiff, by the use of expert testimony, must establish the standards of care against which the defendant doctor's conduct is measured. The plaintiff must then further prove by affirmative evidence that, judged in light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused injury to the plaintiff." (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301.)

Pared of extraneous facts, Mrs. Waterford's claim is that, because of her symptomology, a competent gynecologist would have suspected a post-operative infection. Given this suspicion, the physician should have performed repeated pelvic examinations of plaintiff in an effort to detect pelvic abscesses, and to treat any such abscess which developed. Dr. Halloway's failure to so proceed, from plaintiff's perspective, constituted a culpable deviation from the standard of care giving rise to liability for malpractice.

The duty of a physician providing medical care is defined by whether the doctor possessed and employed the knowledge, and used the skill and care, which a reasonably well-qualified and competent specialist in the same field, and practicing in the same locality, would ordinarily use in similar cases and circumstances. (*Northern Trust Co. v. Skokie Valley Community Hospital* (1980), 81 Ill. App. 3d 1110, 1126-27, 401 N.E.2d 1246.) These standards are normally established by way of the testimony of expert witnesses. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 257, 381 N.E.2d 279.) Here, plaintiff asserts that both party's experts indicated that competent medical care would mandate pelvic examinations on a repeated basis. Hence, plaintiff posits the standard was established and breached by defendant's failure.

To be sure, there was a great deal of consistency between the testimony of plaintiff's expert, Dr. Buel Morley, and defendant's expert, Dr. Robert Bouer. The experts uniformly asserted that infection was a

common consequence of an invasive surgical procedure such as a hysterectomy. The fact that Mrs. Waterford acquired an infection cannot therefore, standing alone, establish malpractice. The doctors also concurred in their descriptions of the varieties and appropriate treatments of post-operative infections. They stated that infections may be of two types, cellulitis or an abscess. The former is a spreading infection treated with antibiotics, the latter is a localized infection treated by drainage of the abscess itself. The experts noted that abscesses take from four to seven days to develop. As the operation was done on November 27, the abscess would have developed between December 1 and December 4. Dr. Halloway examined Mrs. Waterford on December 2, at which time he did not notice any abscess; rather, he diagnosed her infection as cellulitis.

It is at this point that the schism between the experts emerges. Dr. Morley unequivocally censured defendant for his failure to conduct pelvic examinations from December 2 onward. Dr. Morley opined that while such examinations are not required where a patient's recovery is uneventful, they should be performed regularly when the physician is dealing with complications such as those exhibited by Mrs. Waterford. Dr. Morley could "see no reason why he [Dr. Halloway] did not do any other pelvic exams after December 2." Had he done so, he would have detected the abscess at an earlier juncture, and could have treated it before it necessitated emergency surgery. Phrased another way, Dr. Morley asserted that competent treatment required daily examinations as the standard of care, and Dr. Halloway's failure to perform these examinations constitutes a breach of the duty.

Dr. Bouer, on the other hand, concluded that Dr. Halloway's performance never deviated from the standard of care expected of a reasonably well-qualified gynecologist. Rather, Dr. Bouer concluded that Dr. Halloway methodically confronted each problem as it arose and treated it promptly and correctly. Plaintiff nonetheless finds solace in Dr. Bouer's testimony, seizing on the following colloquy as corroboration of her appellate claim:

"Q. [by plaintiff's counsel]: And repeated pelvic examination is the primary diagnostic tool of determining whether or not there is a bulging abscess in the cul-de-sac?

A. [by Dr. Bouer]: Yes.

Q. Following—and a reasonably well qualified gynecologist would do repeated examination[s] of the pelvic region to ascertain whether or not there were developing abscesses in the patient, is that not correct?

A. I think that repeated pelvic examinations were indicated."

The issue devolves to the question of whether these statements by defendant's expert conform with Dr. Morley's assertions and establish an uncontradicted standard of care. Placed in context, we cannot give them the construction plaintiff suggests.

■ Both experts, when they stated their opinion as to the utility of pelvic examinations, responded in terms of a series of assumptions built into the calculus by plaintiff's counsel. It is tautological that, where an opinion as to the appropriate standard of care is premised on a litany of assumptions, those assumptions must be borne out by the evidence adduced; otherwise, the opinion would be entitled to little weight. (See *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 179, 298 N.E.2d 289.) Here, the utility of the pelvic examination as a diagnostic tool depended on the physician being able to palpate the abscesses. For the abscesses to be palpable, they had to be located within reach of the vaginal cuff.

Dr. Morley asserted that the abscess would be located atop the vaginal cuff, as this was the usual and logical place for the infection to localize following a hysterectomy with the patient immobilized in bed. Dr. Morley acknowledged elsewhere in his testimony, however, that the records of Mrs. Waterford's treatment were indeterminate as to the exact location of the abscesses.

When Dr. Bouer made the statements here at issue, he was asked to assume the location of the abscesses. Elsewhere in his testimony, however, Dr. Bouer elaborated as to the possible location of the abscesses. After noting that there were indications that the intestines were adherent to the vaginal cuff, Dr. Bouer noted that this might insulate the abscesses from the cuff and from probing fingers in a pelvic examination. In Dr. Bouer's words, the abscesses would "not be within reach of the [vaginal] cul-de-sac." Dr. Bouer went so far as to state that even had Dr. Halloway performed daily pelvic examinations, in all likelihood he would not have been able to palpate the plaintiff's abscesses.

■ In light of Dr. Bouer's testimony, several flaws emerge from plaintiff's analysis. First, we cannot accept plaintiff's appellate assertion that the experts were in accord as to the applicable standard of care owed Mrs. Waterford and Dr. Halloway's alleged breach of that duty. To the contrary, it is clear that Dr. Morley's opinion would require daily pelvic examinations, while Dr. Bouer would not require them in the absence of bulging into the vaginal cuff or cul-de-sac. This latter fact was not definitively proven at trial. The weight to be as-

signed expert testimony in such cases is a question for the jury, as the trier of fact. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 260, 381 N.E.2d 279; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301.) Given the disagreement of the experts, we cannot conclude that the jury's verdict was against the manifest weight of the evidence. See *Broussard v. Huffman Manufacturing Co.* (1982), 108 Ill. App. 3d 356, 365, 438 N.E.2d 872 (for the jury's verdict to be against the manifest weight of the evidence, it must appear that the jury's conclusions are palpably erroneous and wholly unwarranted).

 █ Indeed, in light of the discord between Drs. Morley and Bouer, we must question whether a unitary standard of care was established for jury consideration. It is well recognized that the failure to establish such a standard is fatal to a medical malpractice action. *Eckley v. St. Therese Hospital* (1978), 62 Ill. App. 3d 299, 309, 379 N.E.2d 306; *Burrow v. Widder* (1977), 52 Ill. App. 3d 1017, 1023, 368 N.E.2d 443.

> "It is insufficient for plaintiff to establish a *prima facie* case merely to present testimony of another physician that he would have acted differently from the defendant, since medicine is not an exact science. It is rather a profession which involves the exercise of individual judgment within the framework of established procedures. Differences in opinion are consistent with the exercise of due care." (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 261, 381 N.E.2d 279.)

In this latter case, the Illinois Supreme Court went on to note that a difference of opinion as to the proper course of treatment leaves the trier of fact without guidance as to the applicable standard of care. In *Walski*, one physician stated that the decision of the surgeon to isolate a particular nerve during the course of an operation varied from case to case, while another physician stated that he would not consider it a "proper option" for a surgeon to fail to identify and preserve that nerve. Given this state of facts, the court held that no standard of care was established for the jury to consider. The jury therefore could not determine whether a deviation from the standard occurred. Similarly herein, we are presented with a difference of opinion between two experts as to the appropriate procedure for the physician to follow. We cannot conclude that plaintiff is entitled to a reversal based on a purported insufficiency of the evidence where we cannot state that plaintiff established the requisite standard of care in the first place.

Even were we to find that Dr. Morley's testimony established a standard of care, we would still be forced to uphold the jury's verdict.

The pelvic examination assertedly mandated was not a formalism; rather, it was a purposeful action on the part of the physician designed to detect the presence of abscesses. It is particularly notable in this regard that Dr. Morley stated that, in addition to pelvic examinations, there are other diagnostic tools and procedures which could be used to detect the presence of abscesses. Dr. Morley specifically referred to the sonogram, and we note that a sonogram was done on plaintiff on December 7. That test revealed the existence of plaintiff's abscesses, and Dr. Halloway's treatment immediately proceeded on the basis of this new information.

It thus appears that any of a number of medically recognized procedures would be adequate for the purpose of detecting abscesses. It necessarily follows that the usage of one such test obviates the need to perform other tests, absent a standard of care requiring confirmatory tests. We cannot fault Dr. Halloway's choice of the sonogram over pelvic examinations, particularly in light of Dr. Morley's testimony that other procedures would yield the same result.

■ Our conclusion that defendant did not deviate from the standard of care is buttressed by the sequence of events herein. On December 2, when defendant performed the only pelvic examination revealed in the record, he diagnosed cellulitis. His failure to diagnose the abscess may be explained simply by the fact that the abscess may not have developed at that time. The experts agreed that an abscess might not develop for seven days, and might not be detected until then. Dr. Halloway proceeded on the basis of his diagnosis, which in his opinion preempted pelvic examinations. According to defendant, pelvic examinations of a patient with cellulitis might cause the further spreading of the infection, clearly something to be avoided. It follows that Dr. Halloway's failure to perform pelvic examinations did not constitute malpractice. In a jury trial, the jury is the sole judge of the credibility of the witnesses and its verdict will not be overturned unless it is against the manifest weight of the evidence. (*Wisniewski v. City of Chicago* (1974), 20 Ill. App. 3d 650, 315 N.E.2d 43.) We cannot say that Dr. Halloway's testimony was contrary to logic or inherently unbelievable. The jury was entitled to place credence in that testimony, which indicated that pelvic examinations were contraindicated.

■ Finally, we cannot discount Dr. Bouer's assertion that even had defendant performed the test, he would not have palpated the abscesses. Plaintiff was obligated at trial to demonstrate a duty, the breach of that duty, and injury arising from that breach. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) As a consequence, according

to Dr. Bouer, even had the test been performed, no change would have resulted in the information known to Dr. Halloway, his diagnosis would have been unaltered, and the treatment plan would similarly have remained the same. If the jury assigned credibility to Dr. Bouer, it might rationally conclude that the test would not have affected plaintiff's treatment if performed. Indeed, the jury may have concluded that pelvic examinations were useless. We cannot substitute our judgment on this issue for that of the jury. (*Wisniewski v. City of Chicago* (1974), 20 Ill. App. 3d 650, 315 N.E.2d 43.) Under such circumstances, we must affirm the jury's verdict.

■ Plaintiff next argues that the trial court erred when it permitted defendant to question Drs. Ashley and McCarthy as experts, over her objection. Plaintiff notes that these gentlemen had not been designated as experts in defendant's discovery disclosure. Based on that lapse, plaintiff asserts that this questioning surprised her at trial, that she was unprepared for this testimony, and that she was prejudiced by its admission. In other words, plaintiff's claim is that rather than choose between the expert's opinions, the case was submitted to the jury as Dr. Morley's opinion versus the combined opinions of Drs. Bouer, Ashley, McCarthy and Halloway, to her detriment.

In analyzing this claim, we must first note the specific references of each physician that plaintiff finds objectionable. As to Dr. McCarthy, plaintiff objects to his testimony on the propriety of an abdominal approach to the second surgery rather than a vaginal approach. Plaintiff's expert had asserted that defendant erred in electing the former over the latter approach. As to Dr. Ashley, plaintiff claimed that the doctor should not have been permitted to testify as to the adequacy of care accorded plaintiff from an infectious disease standpoint. Dr. Ashley was an internist specializing in infectious diseases, and one of the ultimate issues was the propriety of defendant's treatment of plaintiff's post-operative infection.

It is clear that parties are required to disclose the names of expert witnesses which it seeks to call at trial. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1003(c).) The purpose of this rule is to promote the fact-finding process and to eliminate any tactical advantage or surprise to either side, in civil as well as criminal cases. (*People v. Mahdi* (1980), 89 Ill. App. 3d 947, 412 N.E.2d 669.) This purpose must guide our inquiry.

In other cases, it has been held that the failure to list an individual as an expert witness prior to trial may not mandate reversal where the aggrieved party was not surprised by the testimony or the party introducing the witnesses' testimony obtained no advantage

from its failure to disclose. (*Joynt v. Barnes* (1979), 71 Ill. App. 3d 187, 202-03, 388 N.E.2d 1298; *Collins v. Interroyal Corp.* (1984), 126 Ill. App. 3d 244, 252, 466 N.E.2d 1191.) Here, we can hardly say that plaintiff was surprised by the testimony of the doctors. Both of these gentlemen were treating physicians. Dr. Ashley had seen her daily after he was called onto the case by defendant regarding the infection. Dr. McCarthy performed the surgery at which the abscess was drained. It would strain reason to conclude that plaintiff was somehow unaware of these doctors or their familiarity with the case. Indeed, it was this familiarity which led plaintiff to call Dr. McCarthy as her witness.

Moreover, contrary to plaintiff's appellate assertions, the doctors never offered their opinions as to the adequacy of defendant's care from a gynecological perspective. Rather, each doctor was carefully questioned regarding concerns within the realm of their experience and training. Dr. Ashley was questioned regarding the treatment of the infection; this was his specialization. Dr. McCarthy was examined regarding the choice of surgical approaches; he was the individual who chose the approach. Under these circumstances, it hardly seems fair to reverse the jury's verdict owing to defendant's failure to name these doctors in his disclosure.

Moreover, defendant's observation that these questions were invited responses to questions propounded by plaintiff appears to be well taken. Taking Dr. McCarthy's testimony first, plaintiff asserts that questioning regarding his choice of surgical approaches was irrelevant, since Dr. McCarthy was not a gynecologist. This protest simply is irrelevant itself. Evidence is relevant if it tends to prove an issue in controversy, or makes a matter at issue more or less probable. (*Joynt v. Barnes* (1979), 71 Ill. App. 3d 187, 199, 388 N.E.2d 1191.) Here, Dr. Morley had condemned the fact that drainage was performed abdominally rather than by the vaginal route. Inasmuch as it was Dr. McCarthy who chose the approach to which defendant acceded, his testimony on this point was extremely relevant. It was all the more relevant because plaintiff, by her own admission, was careful to skirt the choice of approaches entirely in her questioning of Dr. McCarthy. We can hardly fault defendant for exploring so obviously relevant an area, particularly in light of plaintiff's recalcitrance to inquire on this pertinent question.

The fact that Dr. McCarthy was not a gynecologist was brought out by the parties. It was plaintiff's responsibility to dissipate any impact Dr. McCarthy's testimony might have had on the jury's appraisal of the propriety of defendant's conduct as a gynecologist. We note

that plaintiff did inform the jury that the standard of care was defined through the testimony of Dr. Morley and Dr. Bouer, stating "[a]nd juries like you set the standard of care in our community of what do we accept from our physicians and what do we not accept. *** You are to make the determination [based on] the credibility of those two witnesses," Drs. Morley and Bouer.

■ As to Dr. Ashley, plaintiff elicited from her expert that the cultures taken from the plaintiff at Dr. Ashley's behest were worthless. Clearly, it was proper to permit defendant to explore Dr. Ashley's assessment of the utility of the cultures. More significantly, plaintiff has attacked defendant's handling of the infection she developed following the surgery. Dr. Ashley's opinions were explicitly limited to the infection, and did not travel into the area of the standard of care of a competent gynecologist. Again, we must emphasize that the jury was informed that they were to determine the standard of care based on the testimony of Drs. Bouer and Morley. This view was reaffirmed by the trial court, which explicitly informed the jury that the standard of care was to be determined "from evidence presented in this trial by doctors *called as expert witnesses.*" (Emphasis added.) Neither Dr. Ashley nor Dr. McCarthy was called as an expert, and as noted their testimony was carefully circumscribed to prevent the inference that they were testifying as to the standard of care of a gynecologist. Accordingly, we must reject plaintiff's claim of error.

■ ■ Finally, plaintiff claims that the trial court erred when it declined to directly respond to a question submitted by the jury. The jury asked whether they were required to find that all four allegations of malpractice had to be established in order to find for plaintiff. The court merely informed the jury to reread the instructions they had already received. Plaintiff claims that the jury misapprehended the instructions, and as a result returned an erroneous verdict.

We cannot agree with plaintiff herein. The decision to answer a jury question is one resting in the sound discretion of the trial court, and will not be disturbed unless that discretion was abused. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) In the instant case, plaintiff's counsel directly addressed this problem in closing argument. There, he stated that the jury need find only one of the allegations of malpractice to have been established in order to return a verdict for plaintiff. If there was any question as to whether the jury understood this or not, the instructions provided that plaintiff had the burden of proving that defendant "acted or failed to act in *one* of the ways claimed by plaintiff" to amount to negligence. This instruction explicitly answered the jury's query. Indeed, this instruction informed

the jury in precisely the manner plaintiff would have had the judge answer the question. Accordingly, we cannot state that the trial court abused its discretion by failing to directly tell the jury what the instructions already stated.

Moreover, it is well established in Illinois that a jury verdict may not be impeached by a juror affidavit which alleges that the jury misconstrued the instructions. (*Chalmers v. City of Chicago* (1982), 88 Ill. 2d 532, 431 N.E.2d 361.) Here, plaintiff asks that we conclude that the jury misconstrued the above cited instruction based on affidavits filed in the post-trial stage. This we cannot do. A verdict may not be impeached because of a jury's misunderstanding of the instructions or the consequences of their findings. (*Chalmers v. City of Chicago* (1982), 88 Ill. 2d 532, 539, 431 N.E.2d 361.) Accordingly, we must reject plaintiff's argument that the judge erred in failing to answer the jury's question and the argument that the jury misunderstood the instructions themselves.

For the above stated reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BILANDIC, P.J., and STAMOS, J., concur.